In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-1935

DARREL SMITH,

*Plaintiff-Appellant*,

*v.*

DENISE BRAY,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:09-cv-3615—**John W. Darrah**, *Judge.*

ARGUED OCTOBER 26, 2011—DECIDED MAY 24, 2012

Before RIPPLE and HAMILTON, *Circuit Judges*, and
MYERSCOUGH, *District Judge.**

HAMILTON, *Circuit Judge.* In most employment dis-
crimination cases that arise in the private sector, the
defendants are the employers themselves, most often
corporations or other business organizations. In this case

---

* The Honorable Sue E. Myerscough of the Central District
of Illinois, sitting by designation.

of alleged race discrimination and retaliation, however, the employer has gone through bankruptcy and so cannot be sued for relief. The plaintiff in this case has sought relief from two individuals who worked for the bankrupt employer. Such claims are permitted under 42 U.S.C. § 1981 for race discrimination and retaliation in contractual relationships, including employment. In this appeal we consider what is needed to prove that a particular individual is legally responsible for the alleged discrimination and/or retaliation. We also address the problem that can arise when a party moving for summary judgment uses her reply brief to object to the admissibility of evidence on which the non-moving party relies in opposing summary judgment, and the non-moving party has no further opportunity to respond to the objection.

Plaintiff Darrel Smith claims that he endured serious racist harassment from his immediate supervisor at former defendant Equistar Chemicals, LP, and was fired for complaining about it. Equistar was an affiliate of another former defendant, Lyondell Chemicals Company, but both companies are now bankrupt and discharged from any liability to Smith. His only hope for a damages remedy was to sue the individuals responsible for the alleged wrongs. Smith has settled his claims against the primary wrongdoer, his former supervisor James Bianchetta. This appeal involves Smith's claims against Equistar's human resources manager Denise Bray, who Smith says conspired with Bianchetta to retaliate against him in violation of § 1981. Smith asserts that Bray ignored his complaints about the harassment and per-

suaded her bosses to terminate him to retaliate for lodging them. The district court granted Bray's motion for summary judgment, and Smith appeals.

We must decide whether Smith presented sufficient evidence: (1) that Bray caused him to be fired; and if so, (2) that she acted with the motive to retaliate against him. Although we find that Smith has presented evidence sufficient to raise a genuine issue of material fact as to whether Bray participated in the decision to fire him, we hold that he has not offered sufficient admissible evidence to allow a reasonable jury to find that she was motivated by a desire to retaliate against him for his complaints of race discrimination.

I. *Factual and Procedural Background*

We review *de novo* the district court's decision to grant summary judgment to Bray. *E.g.*, *Gross v. PPG Industries, Inc.*, 636 F.3d 884, 888 (7th Cir. 2011). "Summary judgment is appropriate when there are no genuine issues of material fact and judgment as a matter of law is warranted for the moving party." *Id.*, citing Fed. R. Civ. P. 56(a) and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). We may affirm summary judgment for Bray only if no reasonable trier of fact could find in Smith's favor. *E.g.*, *id.* Because we are reviewing summary judgment against Smith, our account of the facts gives him the benefit of conflicts in the admissible evidence and favorable inferences from that evidence, but we do not vouch for the objective truth of this account. See *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

In November 2000, Smith began working as a process technician at Equistar's polypropylene unit in Morris, Illinois. From June 2003 forward, Smith's direct supervisor was former defendant James Bianchetta. Smith is African American; Bianchetta is white. Smith has testified that Bianchetta and some co-workers made viciously racist statements in his presence. Among them were statements that black people are lazy; that slavery should be revived; that Hurricane Katrina was a good thing to the extent it removed African Americans from prime real estate in New Orleans; and that the growth of the black population should be limited by mandatory abortions and castrations. Smith testified that these offensive racist conversations took place at least weekly. Bianchetta would also call Smith into his office to subject him to hours-long racist tirades, and toward the end of Smith's employment such harassment occurred multiple times per week.

Defendant Bray was the manager of the Equistar plant's human resources department and was responsible for investigating complaints of discrimination there. Smith complained about Bianchetta's harassment several times to Joy Nixon, a human resources representative, who relayed Smith's complaints to Bray. Also, the polypropylene unit superintendent, Jim Arrajj, testified that in May 2006, Bray showed him a complaint from Smith describing racist statements made by co-workers. Equistar company policy required local human resources managers like Bray to notify the corporate human resources department when they learned that racial harassment had occurred. Bray did not recall

ever discussing Smith's complaints with anyone in the corporate office, nor did Bray herself discipline Bianchetta or any other employee for harassing Smith.

Smith also reported having conflicts with other employees, including Mark Hieser, a white process technician on a different shift. In 2004, Smith complained several times to Bianchetta, Bray, and Nixon about Hieser "not doing his job." Hieser countered that Smith was not cleaning up the work area after his shift. Smith complained about Hieser's "constant harassment" to Bray, who told him that Hieser was an "equal opportunity picker" and that she would not get involved. On February 3, 2005, an anonymous caller registered an employee hotline complaint accusing Smith of using incorrect materials. Hieser submitted a statement about Smith's error, prompting Smith — according to the hotline caller — to call Hieser a "racist bigot m***** f*****" and to say that the "gloves are off" and "I'll get even after this." Smith denied making the statements. Hieser reported this incident to Bray, who investigated and did not discipline either man.

In January 2006, Smith volunteered for a special project to boost his promotion prospects. The project required Smith to identify, test, and label hundreds of circuit-breakers in the Morris plant and to enter his findings in an electronic spreadsheet. The breaker project was in addition to Smith's other responsibilities. At some point during Smith's work on the project, an employee placed a sign in Smith's work area that said "DVL," which apparently meant that Smith "does very

little." On April 9, 2006, an anonymous caller registered a second hotline complaint about Smith, this one accusing him of sleeping on the job and keeping inaccurate time records of his work hours. Smith was not disciplined for his alleged dozing, but he and other employees received oral reprimands for the time-sheet discrepancies. On May 1, 2006, Smith stopped working on the incomplete breaker project because another employee was taking over his duties. Bianchetta asked Smith to transfer his work product to the replacement, but Smith refused. Equistar's information technology department recovered the spreadsheet and found it to be largely blank. Around June 7, 2006, Bianchetta issued a written reprimand to Smith for deleting the spreadsheet. Smith blamed co-workers for erasing the data.

During the first few months of 2006, Smith and Bianchetta argued frequently. In one argument, Bianchetta raised his voice, slammed the door, and indicated that he was going to tell Bray that Smith had been insubordinate. Smith retained a lawyer. When Bianchetta learned this, he told Smith that getting a lawyer was "the worst f***ing thing you can do," that he would "let Denise [Bray] know that you have a lawyer," and that "we're going to deal with you from here on, from this point on. You're going to be sorry. You're going to regret this." Smith Dep. 345.

The situation deteriorated even further in June 2006. One day in mid-to-late June, Smith discovered garbage and feces in his locker. Smith saw a psychologist and

physician the next day, and he called Bianchetta to explain his absence and to inform him that he would be pursuing a medical leave. Bianchetta told him, "ain't nothing wrong with you and you're faking it, and Denise [Bray] and I already know, you won't be coming back." Smith Dep. 162. In a later phone call, Bianchetta elaborated, "you're fired, and [Bray] and myself said you're fired and you won't be coming back." *Id*. at 173. During his absence from work, Smith also called Bray, who told him, "if Jim [Bianchetta] is not going to talk to you[,] I'm not going to talk to you." *Id.* at 169. (Bianchetta had instructed his employees not to accept telephone calls from Smith during his absence.)

On June 19, 2006, Smith applied for short-term disability benefits through Concentra, a third-party administrator of benefits for Equistar. Around the same date, Smith received a note from his doctor advising him not to work for two weeks because of work-related stress. Smith also informed Bianchetta of the doctor's recommendation. On June 23, Concentra tried to contact Smith's doctor to verify his medical status but was not successful. On June 28, Concentra informed Smith that it could not complete its review of his claim because it had been unable to obtain sufficient information. On July 6, Smith's doctor sent him a letter directing him not to work for thirty days, and Concentra received a copy. On July 21, Concentra called Smith's doctor. Although it is not clear that a Concentra representative actually spoke with the physician, that same day Concentra denied Smith's applica-

tion.[1] Smith did not return to work after he received Concentra's notice of denial, but he filed an appeal with Concentra on July 28. Concentra asked Smith to send his relevant medical records, for purposes of the appeal, but he did not do so. Concentra denied Smith's appeal on August 1, 2006 and notified Equistar of the denial.

Plant manager Richard Purgason learned of Concentra's decision, decided that Smith had been absent from work without leave, and directed Bray to ask corporate headquarters for permission to fire Smith. Equistar's termination policy was structured as follows: the supervisor and plant manager would direct Bray to file a termination request with headquarters; Bray would send the request to headquarters; and Bray would gather facts and coordinate the termination proceedings. Bray did not have the authority to fire an employee, but she prepared the termination report for Purgason, who testified that human resources managers like Bray were

---

[1] Smith claims that Bray gave false and damaging information to Concentra that led Concentra to deny his leave request. Smith's only evidence for this allegation comes from Concentra's case notes, which the district court did not consider because they, along with numerous other statements contained in Smith's summary judgment materials, contained hearsay, lacked foundation, and were unauthenticated. The district court's decision on this point was not an abuse of discretion, and Smith's effort to supplement the record after the district court ruled came too late. We also do not consider his factual allegations based on Concentra's case notes.

involved in termination decisions "to some degree." Purgason spoke with Bray frequently in summer 2006 about Smith's absences, his request for disability leave, and Concentra's denial of it. Arrajj, the unit superintendent, also indicated that Bray regularly participated in the disciplinary decision-making process, although he added that such decisions were often made by consensus among a group of supervisors.

Smith received notice of his termination on August 4, 2006. Equistar informed Smith that he was being terminated because his "absence since June 21, 2006 [had] not been certified by medical case management. This absence is considered an absence without leave in clear violation of the Company's policies and procedures." Smith later admitted that at the time of his firing he felt ready to return to work and that he had asked Bianchetta to put him on the work rotation.

Smith originally filed his discrimination and retaliation claims against four defendants — Equistar, its parent/affiliate Lyondell, and Bianchetta and Bray as individuals. Smith voluntarily dismissed that complaint because Equistar and Lyondell filed for bankruptcy protection that discharged such pre-filing debts. Smith then filed an amended complaint against only Bianchetta and Bray alleging race discrimination and retaliation in violation of 42 U.S.C. § 1981. The district court denied Bianchetta's motion for summary judgment, and he then reached a settlement with Smith. The district court granted Bray's motion for summary judgment on all of Smith's claims against her.

The focus of this appeal is Smith's retaliation claim, which the district court rejected for two reasons. First, the court did not find sufficient evidence that Bray had participated in his termination. Second, even if Bray had contributed to causing Smith's termination, there was no evidence that she did so because he had complained about discrimination. Although we disagree on the first point and find that Smith presented sufficient evidence to permit a finding that Bray participated in the decision to fire him, we agree with the district court on the second point. We affirm summary judgment in favor of Bray because Smith has identified no admissible evidence supporting a finding that she acted for a retaliatory purpose.

II. *Analysis*

Just after the Civil War, and long before enactment of Title VII of the Civil Rights Act of 1964 outlawed race discrimination and retaliation in most employment, Congress enacted the Civil Rights Act of 1866, which protects the right of all persons "to make and enforce contracts" regardless of race. 42 U.S.C. § 1981(a). The Supreme Court gave a narrow construction to that key phrase in *Patterson v. McLean Credit Union*, 491 U.S. 164, 171 (1989), by holding that § 1981 did not apply to conduct after a contractual relationship had been established. Congress then superseded *Patterson* by providing broadly that the statute protected "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and

conditions of the contractual relationship." Civil Rights Act of 1991, Pub. L. No. 102-166, § 101, 105 Stat. 1071, codified at 42 U.S.C. § 1981(b); see *Jones v. R. R. Donnelley & Sons Co.*, 541 U.S. 369, 383 (2004) ("The 1991 Act over-turned *Patterson* by defining the key 'make and enforce contracts' language in § 1981 to include the 'termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.'").

The Supreme Court has held that § 1981 authorizes claims for retaliation, if one person takes action against another for asserting the right to substantive con-tractual equality provided by § 1981. *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 445 (2008). In the context of laws governing employment rights, "unlawful retalia-tion occurs when an employer takes an adverse employ-ment action against an employee for opposing impermis-sible discrimination." *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003). The substantive standards and methods of proof that apply to claims of racial discrim-ination and retaliation under Title VII also apply to claims under § 1981. See *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403-04 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008).[2]

---

[2] One key difference between § 1981 and Title VII is that the latter authorizes suit only against the employer as an entity rather than against individual people who are agents of the employer. Under § 1981, individuals may be liable. Compare *Williams v. Banning*, 72 F.3d 552, 555 (7th Cir. 1995) (holding that supervisor may not held liable in his individual

(continued...)

Under both statutes, a retaliation plaintiff may proceed under the "direct" or "indirect" methods of proof. *Id*. at 404. In the district court, Smith advanced both methods in opposing summary judgment, but on appeal he relies only on the direct method. To avoid summary judgment on his retaliation claim against Bray under the direct method, Smith must present direct evidence of (1) his statutorily protected activity; (2) a materially adverse action taken by Bray; and (3) a causal connection between the two. See *Coleman v. Donahoe*, 667 F.3d 835, 859 (7th Cir. 2012). Smith easily satisfies the first element. As the district court noted, "there is no real dispute that Smith complained about perceived discrimination." The other two elements present closer questions.

---

(...continued)

capacity for discrimination under Title VII), with *Patterson v. County of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004) ("individuals may be held liable under §§ 1981 and 1983 for certain types of discriminatory acts"). Other important differences are that claims under § 1981 have a relatively long four-year statute of limitations, see *Jones v. R. R. Donnelly & Sons Co.*, 541 U.S. 369, 382 (2004); *Dandy v. United Parcel Service, Inc.*, 388 F.3d 263, 269 (7th Cir. 2004), are not subject to the damage caps enacted in the Civil Rights Act of 1991, see 42 U.S.C. § 1981a(b)(4), and do not require exhaustion of administrative remedies. See, *e.g.*, *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 539 (7th Cir. 2007).

A.  *Bray's Participation in Smith's Termination*

When Smith was fired, he suffered an adverse action sufficiently serious to support a claim for retaliation. Because he has sued Bray as an individual, the relevant point of disagreement is whether Bray "participated" in his termination for purposes of § 1981. Cf. *Musikiwamba v. Essi, Inc.*, 760 F.2d 740, 753 (7th Cir. 1985) ("personal liability cannot be imposed on a corporate official for the corporation's violation of section 1981 when that official is not alleged to have participated in actual discrimination against the plaintiff"). Smith does not argue that Bray fired him herself. His theory is that she prevailed on plant manager Purgason and other decision-makers to fire Smith by providing damaging information to Purgason and then, at his request, prepared the report formally requesting Smith's termination.

Our cases have long recognized that a final decision-maker's reliance on an improperly motivated recommendation from a subordinate may render the corporate employer liable because the subordinate acts as the firm's agent. See, *e.g., Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990) ("If the [formal decision-makers] acted as the conduit of the [subordinate's] prejudice — his cat's-paw — the innocence of [the decision-makers] would not spare the company from liability."); see also *Hicks v. Forest Preserve Dist.*, No. 11-1124, 2012 WL 1324084, at *6 (7th Cir. Apr. 18, 2012) (applying cat's paw theory to retaliation claim under Title VII). As applied in this circuit, "cat's paw" liability may be imposed on an employer "where the plaintiff can show that an employee

with discriminatory animus provided factual informa-
tion or other input that may have affected the adverse
employment action." See *Alexander v. Wisconsin Dep't
of Health & Family Services*, 263 F.3d 673, 684 (7th Cir.
2001), quoting *Dey v. Colt Construction & Development
Co.*, 28 F.3d 1446, 1459 (7th Cir. 1994).[3]

The Supreme Court endorsed the "cat's paw" theory of
employer liability in *Staub v. Proctor Hosp.*, 131 S. Ct.
1186, 1191 (2011) (applying theory to claim suit under
Uniformed Services Employment and Reemployment
Rights Act of 1994, which is "very similar to Title VII").
This circuit and many others have also held or assumed
that a cat's paw theory will support holding the *employer*
vicariously liable under both § 1981 and 42 U.S.C. § 1983,
which applies to local governmental entities (and state
and local government employees sued in their official
capacities). See, *e.g.*, *Chappell v. Bilco Co.*, 675 F.3d 1110,
1120 (8th Cir. 2012) (applying cat's paw theory to

---

[3] The "cat's paw" theory derives its name from a fable in
which a monkey convinces an unusually dim cat to pull chest-
nuts out of a hot fire. *Cook v. IPC Int'l Corp.*, 673 F.3d 625, 628
(7th Cir. 2012). "As the cat scoops the chestnuts from the fire
one by one, burning his paw in the process, the monkey
eagerly gobbles them up, leaving none left for the cat." *EEOC
v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484
(10th Cir. 2006). In the law of employment discrimination,
the "cat's paw" theory can apply when a biased subordinate
who lacks decision-making power uses the formal decision-
maker "as a dupe in a deliberate scheme to trigger a discrim-
inatory employment action." *Id.*

plaintiff's § 1981 retaliation claims, but distinguishing *Staub* on its facts); *Amini v. City of Minneapolis*, 643 F.3d 1068, 1075 n.6 (8th Cir. 2011) (in race discrimination case brought against city under § 1981, stating that "[i]f a non-decision-maker performs an act motivated by a discriminatory bias that is intended to cause, and that does proximately cause, an adverse employment action, then the employer is liable under the cat's paw theory of liability"); *Campion, Barrow & Assocs., Inc. v. City of Springfield*, 559 F.3d 765, 771 (7th Cir. 2009) (in § 1983 action, stating that plaintiff did not "make the argument that the [decision-making] aldermen merely functioned as the 'cat's paw' of those with identifiable retaliatory motive," but assuming that a cat's paw theory would be available in a case in which the evidence showed that decision-makers "relied on . . . the [subordinate's] . . . intent, making it permissible to base municipal liability on [his] discriminatory animus"); *Arendale v. City of Memphis*, 519 F.3d 587, 604 n.13 (6th Cir. 2008) (in § 1983 discrimination and retaliation action, stating that "[w]hen an adverse hiring decision is made by a supervisor who lacks impermissible bias, but that supervisor was influenced by another individual who was motivated by such bias, this Court has held that the employer may be held liable under a 'rubber-stamp' or 'cat's paw' theory of liability"); *Quinn v. Monroe County*, 330 F.3d 1320, 1327 (11th Cir. 2003) (in § 1983 retaliation case, stating that a "decision-maker may serve as the conduit of the subordinate's improper motive, for example, if he merely 'rubber-stamps' the recommendation of a subordinate"), quoting *Hitt v. Connell*, 301 F.3d 240, 248 (5th Cir. 2002)

(same); *Kendrick v. Penske Transportation Services, Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000) (in the § 1981 discrimination context, assuming that an employer "may be held liable if the manager who discharged the plaintiff merely acted as a rubber stamp, or the 'cat's paw,' for a subordinate employee's prejudice, even if the manager lacked discriminatory intent"). Cf. *Waters v. City of Chicago*, 580 F.3d 575, 586 n.2 (7th Cir. 2009) (questioning whether cat's paw theory can be used to establish municipal liability under § 1983 where the biased subordinate is not a policy-maker).[4]

In addition, at least five circuits have indicated that a cat's paw theory would support imposing *individual* liability under § 1983 on subordinate governmental employees with unlawful motives who cause the real decision-makers to retaliate. See, *e.g.*, *Tejada-Batista v. Morales*, 424 F.3d 97, 102 (1st Cir. 2005) (affirming jury verdict against subordinate law enforcement officers who, to retaliate against plaintiff for engaging in protected First Amendment activity, recommended plaintiff's discharge; the "properly motivated" decision-maker "does not insulate[ ] the ill-motivated subordinate" who "is a but-for cause of the firing"); *Maestas v. Segura*, 416 F.3d 1182, 1191 (10th Cir. 2005) ("While Segura made the final decision to transfer Plaintiffs, Pratt, though a subordinate, might be liable if he

---

[4] Because this case arises in the private sector under § 1981, we need not consider who is a policy-maker and related issues of municipal liability that can complicate cases under § 1983.

possessed a retaliatory motive which set in motion the events that ultimately led to Plaintiffs' transfers. In this case, Pratt did *not* set in motion the chain of events which ultimately led to Plaintiffs' transfers.") (citations omitted); *Strahan v. Kirkland*, 287 F.3d 821, 826 (9th Cir. 2002) ("Even if the ultimate decision-maker can establish that the adverse action was not in retaliation for protected conduct, *a subordinate with a retaliatory motive can be liable* 'if an improper motive sets in motion the events that lead to termination that would not otherwise occur . . . . [A] subordinate cannot use the nonretaliatory motive of a superior as a shield against liability if that superior never would have considered a dismissal but for the subordinate's retaliatory conduct.'") (emphasis added), quoting *Gilbrook v. City of Westminster*, 177 F.3d 839, 854-55 (9th Cir. 1999); *Darnell v. Ford*, 903 F.2d 556, 561-62 (8th Cir. 1990) (affirming jury verdict against defendant, a subordinate patrol major who investigated the conduct of and recommended the demotion of a captain, for violating the captain's First Amendment right of association); *Saye v. St. Vrain Valley Sch. Dist. RE-1J*, 785 F.2d 862 (10th Cir. 1986) (reversing directed verdict for defendant school district *and defendant principal* in § 1983 retaliation action brought by teacher because she presented evidence that principal had recommended her non-renewal in retaliation for her union participation, that the superintendent "relied on [the principal's] recommendation to a substantial extent in presenting the matter to the School Board," and that "School Board members . . . relied completely on the recommendations of the administra-

tion in voting not to renew" plaintiff's contract); *Professional Ass'n of Coll. Educators v. El Paso County Cmty. Coll. Dist.*, 730 F.2d 258, 266 (5th Cir. 1984) (upholding liability under § 1983 of college president who recommended discharge of faculty members in retaliation for First Amendment activity where the Board of Trustees followed that recommendation, and holding that "[i]t is not necessary that the improper motive be the final link in the chain of causation: if an improper motive sets in motion the events that lead to termination that would not otherwise occur, intermediate step[s] in the chain of causation' do not necessarily defeat the plaintiff's claim") (internal quotation marks omitted).[5] As with § 1981, individual liability under § 1983 is appropriate

---

[5] The Eighth Circuit has stated that the "innocent decisionmaker" should not be held personally liable under § 1983 for the discriminatory animus of a subordinate. See *Dedmon v. Staley*, 315 F.3d 948, 949 n.2 (8th Cir. 2003) ("Although other circuits have stated that discriminatory or unlawful motive can be imputed to the formal decisionmaker [under § 1983], we think that is only for the limited purpose of determining whether the employer could be held liable. We found no case suggesting that an otherwise innocent decisionmaker could be personally liable for the discriminatory motive of another.") (internal citation omitted). That reasoning is consistent with the cases cited in the text, including the Eighth Circuit's own decision in *Darnell*, 903 F.2d at 561-62, which show that individual liability under § 1983 may be imposed only on the biased subordinate (that is, the manipulative monkey), not on the duped decision-maker (the gullible cat).

where the "individual defendant caused or participated in a constitutional deprivation." *Hildebrandt v. Illinois Dep't of Natural Resources*, 347 F.3d 1014, 1039 (7th Cir. 2003), quoting *Vance v. Peters*, 97 F.3d 987, 911 (7th Cir. 1996).

So the substantial weight of authority shows that a cat's paw theory will support entity liability for retaliation under Title VII, § 1981, and § 1983, except perhaps when the defendant is a municipal corporation and the biased or retaliatory subordinate is not a policy-maker. Compare *Campion*, 559 F.3d at 771 (assuming theory might establish municipal liability under § 1983 if biased mayor and aldermen had influenced majority of city council to act), with *Waters*, 580 F.3d 586 n.2 (questioning same). There is also precedent from five other circuits for imposing *individual* liability on the unlawfully motivated subordinate (the monkey, in the cat's paw fable) under § 1983. This case presents a related but distinct question of first impression: whether the subordinate with a retaliatory motive may be individually liable under § 1981 for causing the employer to retaliate against another employee.

The answer is yes. In general, the same standards govern intentional discrimination claims under Title VII, § 1981, and § 1983, *e.g.*, *Steinhauer v. DeGolier*, 359 F.3d 481, 483 (7th Cir. 2004), and recognizing individual cat's paw liability under § 1981 is consistent with our parallel approaches to these statutes. It logically follows that an individual can be liable under § 1981 for retaliatory conduct that would expose her employer to liability

under Title VII or § 1981. It also makes sense as a matter of basic fairness: why should the "hapless cat" (or at least his employer) get burned but not the malicious "monkey"? The cat's paw theory can support individual liability under § 1981 for a subordinate employee who intentionally causes a decision-maker to take adverse action against another employee in retaliation for statutorily protected activity.

Applying the theory to the facts of this case, we find that Smith has presented enough evidence to create a genuine issue of fact as to whether Bray intentionally helped cause the adverse employment action against him. In *Staub*, the Supreme Court explained that the "recommendations of [non-decision-makers] that were *designed and intended* to produce the adverse action" may support imposition of liability on the corporate employer. 131 S. Ct. at 1193. The key question is whether the non-decision-maker's actions were a "causal factor," based on common-law proximate cause principles, in the termination decision. *Id.* Our decisions teach that when a subordinate harbors a discriminatory animus and advises the ultimate decision-maker to take an adverse action against the plaintiff, that evidence can support a claim against the corporate employer. See, *e.g.*, *Lust v. Sealy, Inc.*, 383 F.3d 580, 584 (7th Cir. 2004) (holding that where decision-maker would not have turned down plaintiff for promotion but for recommendation of her supervisor, the supervisor's sexism was cause of plaintiff's injury); *Little v. Illinois Dep't of Revenue*, 369 F.3d 1007, 1015 (7th Cir. 2004) ("Even someone who merely recommends a termination is considered a decisionmaker for purposes of assessing

pretext when he was the one functionally, if not formally, responsible for the decision.").

Viewing the evidence here in the light reasonably most favorable to Smith, Bray was substantially involved at every stage of his workplace controversies: his discrimination complaints, his disciplinary issues, his disability-leave application, and the decision to terminate him. She regularly participated in decisions on terminations. She spoke with plant manager Purgason frequently about Smith in the weeks leading up to his termination. A reasonable juror could infer that Purgason relied on Bray's input and advice in deciding to request authority to fire Smith. At Purgason's request, Bray also wrote the report to corporate headquarters requesting the termination, and we can assume for purposes of summary judgment that headquarters relied heavily on Bray's report in deciding to fire Smith. This is enough evidence to create a genuine issue of fact as to whether Bray "provided factual information or other input that may have affected" Smith's termination. See *Alexander*, 263 F.3d at 684, quoting *Dey*, 28 F.3d at 1459. Smith has therefore sufficiently established the second element of the direct method inquiry (Bray's participation in the adverse employment action) to avoid summary judgment.

B. *Retaliatory Motive*

Turning to the final element, however, we agree with the district court that there simply is not enough admissible evidence showing that Bray acted with a retaliatory

motive, *i.e.*, that she caused Smith's termination *because* he had complained about discrimination. As we evaluate this issue, we keep in mind that Bray's day-to-day human resources responsibilities meant that she would be involved in many aspects of Smith's case. Because Smith asserts a claim for individual liability, we must focus on evidence that is admissible against Bray herself concerning her own motives.

To meet the causation or motive requirement, Smith must show that his complaints about Bianchetta were a "substantial or motivating factor" in Bray's decision to recommend his termination. See *Coleman*, 667 F.3d at 860, quoting *Culver v. Gorman & Co.*, 416 F.3d 540, 545 (7th Cir. 2005). Smith could do so with direct evidence, which would "entail something akin to an admission" by Bray that she had a retaliatory motive. See *O'Leary*, 657 F.3d at 630; accord, *Hicks*, 2012 WL 1324084, at *6 & n.2 (affirming judgment for plaintiff on retaliation claim where intermediate supervisor testified that he had been told by his boss that plaintiff had "to be gotten rid of" for complaining about race discrimination). A good example of such an admission by Bianchetta about his own motives appears in Smith's deposition testimony in this very case: Bianchetta's statement to Smith that getting a lawyer (signaling protected activity) was "the worst f***ing thing you can do," and that Smith was "going to be sorry." These alleged statements are direct evidence of only Bianchetta's retaliatory animus—not Bray's. They do not provide direct evidence that Bray herself acted with an unlawful motive.

In the absence of an admission, a retaliation plaintiff may also satisfy the causation or motive element by presenting a "'convincing mosaic' of circumstantial evidence" that would support the inference that a retaliatory animus was at work. See *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004), quoting *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994). In general, there are three categories of circumstantial evidence available to a plaintiff using the "convincing mosaic" approach:

> One includes suspicious timing, ambiguous statements oral or written, . . . and other bits and pieces from which an inference of retaliatory intent might be drawn. Another is evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently. Another type is evidence that the employer offered a pretextual reason for an adverse employment action.

*Coleman*, 667 F.3d at 860 (brackets, citations, and quotation marks omitted). Smith has not offered evidence that similarly situated employees were treated more favorably or that Equistar's reason for terminating him was pretextual. He therefore must try to construct a convincing mosaic of Bray's retaliatory animus through "bits and pieces" that would suggest to a reasonable juror that she tried to get him fired because he had complained about discrimination.

Most of Smith's mosaic consists of "bits" that, without more, do not support an inference that Bray acted with a retaliatory motive, though the point of a mosaic is

that the bits must be considered together. Smith relies most heavily on his own deposition testimony about Bianchetta's direct threat to retaliate when he learned that Smith had hired a lawyer. In making this threat, Bianchetta clearly implied that he intended to work with Bray to retaliate against Smith. That deposition testimony would be sufficient to defeat a summary judgment motion for either the employer or Bianchetta on the issue of retaliatory motive, but as the district court found, it is inadmissible against Bray. Without the Bianchetta threat, Smith's remaining bits of evidence — that Bray rebuffed his attempts to speak with her, that she did not investigate his complaints, and that his termination was proximate in time to his discrimination complaints — are not enough to present a genuine issue of fact as to whether Bray's *personal* motives included retaliation.

### 1. *Bianchetta's Threat to Retaliate*

We focus first on Smith's testimony that Bianchetta made a number of threatening statements indicating that he was working with Bray to retaliate against Smith. After learning Smith had retained a lawyer, Bianchetta told him, "that's going to be the worst f***ing thing you can do," he would "let Denise [Bray] know," "we're going to deal with you from here on," and "You're going to be sorry." Smith Dep. 345. The following day, Smith claims, Bianchetta told him that he had "told Denise you had a lawyer and you're going to find your ass — your ass is almost out of here." *Id*. at 346. As soon as Smith went on

sick leave, Bianchetta allegedly told him: "Didn't you understand what I told you last time[?] [Y]ou're fired, and Denise [Bray] and myself said you're fired and you won't be coming back."

The district court declined to consider Smith's testimony about Bianchetta's statements as evidence against Bray. The court concluded that they were "inadmissible hearsay to the extent . . . offered against Bray" and that no hearsay exception or exemption applied. Even at the summary judgment stage, "we review the district court's decision that a particular statement is not admissible as hearsay under an abuse of discretion standard." *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009).

Smith's deposition testimony about Bianchetta's statements fits the definition of hearsay: "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Bianchetta's statements, as recounted by Smith, were not made at a hearing, and Smith seeks to use them to prove that they were true, *i.e.*, that Bianchetta told Bray that Smith had retained a lawyer, and that they agreed to try to have him fired based at least in part to retaliate against that action. To overcome the hearsay objection by Bray, Smith contends that his testimony about Bianchetta's statements is admissible under the co-conspirator exception to the hearsay rule in Rule 801(d)(2)(E). We deal first with a procedural challenge to the theory and then with the substance.

a.  *The Procedural Problem — No Opportunity to Reply to the Reply*

The procedural challenge is Bray's argument that Smith waived his co-conspiracy theory by not presenting it to the district court. The general rule, of course, is that arguments presented for the first time on appeal are waived. *E.g.*, *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 528 (7th Cir. 2005). Bray's waiver argument, however, raises a problem that can arise in the summary judgment procedure when the moving party asserts in her reply brief that the opposing party is relying on inadmissible evidence. Is it fair to say that an opposing party waived an argument that he never had the opportunity to present in the district court? After all, even when an evidentiary objection seems likely, as in this case, the proponent of the evidence ordinarily need not make an argument in anticipation of an objection that may never be made. With the explosive growth in summary judgment practice in recent decades, this is a quandary that can arise frequently.

The first step is the motion for summary judgment itself, which can merely assert that the opposing party has the burden of proof on a particular issue and has no evidence that can meet that burden. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The opposing party then files opposing papers, including the evidence the party relies upon to meet the burden of proof on the challenged issue. Most courts then allow the moving party to file a reply brief, which provides the moving party an opportunity to object to the admissi-

bility of the evidence the opponent relies upon.[6]
That was the situation here. So the evidence is offered
and an objection is raised. What then? Does the pro-
ponent of the evidence have a good response to the ob-
jection? Does the proponent have an opportunity to
give that response?

If oral argument on the motion is allowed, it could
provide such an opportunity, but many summary judg-
ment motions are decided without oral argument.
Surreply briefs are relatively rare. In the seven districts
in the Seventh Circuit, the local rules of five districts
are silent on the subject of surreply briefs and certainly do
not encourage them. The Southern District of Illinois
flatly prohibits all surreply briefs in its Local Rule 7.1(c).
See S.D. Ill. L.R. 7.1(c). The Southern District of Indiana
allows surreply briefs in opposition to summary judg-
ment motions as a matter of right, though with a
short seven-day deadline and limited to addressing
evidentiary objections in a reply brief and new evidence
submitted with a reply brief. S.D. Ind. L.R. 56-1(d). Another
option may arise when the moving party files a separate

---

[6] Among the seven districts in this circuit, for example, six
have local rules allowing reply briefs on summary judgment.
See S.D. Ind. L.R. 56-1(c) (allowing reply briefs); E.D. Wis.
Civ. L.R. 56(b)(3) (same); C.D. Ill. L.R. 7.1(D)(3) (same); N.D. Ind.
L.R. 56-1(c) (same); N.D. Ill. L.R. 78.3 (assuming reply brief
allowed). The Southern District of Illinois rule states, how-
ever, that reply briefs are not favored and should be filed "only
in exceptional circumstances." S.D. Ill. L.R. 7.1(c). The local
rules of the Western District of Wisconsin are silent on
the matter.

motion to strike evidence submitted by an opponent, but such motions to strike are usually discouraged because of their tendency to multiply the proceedings and prolong briefing.

There is an inherent tension between a court's desire to keep briefing of summary judgment motions within reasonable boundaries and a party's opportunity to be heard on what may be a decisive evidentiary issue. The record here does not indicate that the district court heard oral argument on the defendants' motions for summary judgment, which might have provided an opportunity to address the objection. Smith also might have sought leave to file a surreply brief, but we have previously written that " 'there is no requirement that a party file a sur-reply to address an argument believed to be improperly addressed,' and a party need not 'seek leave to file a sur-reply in order to preserve an argument for purposes of appeal.' " *Costello v. Grundon*, 651 F.3d 614, 635 (7th Cir. 2011) (internal citation omitted) (reversing summary judgment that had been granted based on issue first raised by moving party in his reply brief), quoting *Hardrick v. City of Bolingbrook*, 522 F.3d 758, 763 n.1 (7th Cir. 2008) ("Should a party be required to seek leave to file a sur-reply in order to preserve an argument for purposes of appeal, arguments before the district court would proceed ad infinitum making litigation unruly and cumbersome.").

Along similar lines of basic due process rights, we have often reminded district courts that they may grant summary judgment *sua sponte* only if they have given

the affected parties advance notice of their intent to do so and a fair opportunity to respond with argument and evidence. *E.g.*, *R.J. Corman Derailment Services, LLC v. Int'l Union of Operating Engineers, Local 150*, 335 F.3d 643, 650 (7th Cir. 2003) (reversing summary judgment granted without notice and opportunity to respond); *Simpson v. Merchants Recovery Bureau, Inc.*, 171 F.3d 546, 549 (7th Cir. 1999) (same), citing *Celotex*, 477 U.S. at 326. The same basic principles of fairness apply here. Where the appellant did not have a meaningful opportunity to be heard on the evidentiary issue in the district court, it would not be fair to refuse to consider his arguments presented for the first time on appeal. In managing summary judgment practice in their courts, district courts need to ensure that they do not base their decisions on issues raised in such a manner that the losing party never had a real chance to respond. If a district court does not provide an opportunity to be heard, our doors will be open to consider those arguments.

### b. *The Co-Conspirator Exclusion*

Turning to the substance of the evidentiary issue, Rule 801(d)(2)(E) excludes from the definition of hearsay a statement made by an opposing "party's coconspirator during and in furtherance of the conspiracy." The party seeking admission of a statement under the co-conspirator exemption must demonstrate by a preponderance of the evidence that: "(1) a conspiracy existed, (2) the defendant and the declarant were members of the conspiracy, and (3) the statement sought to be admitted was made

during and in furtherance of the conspiracy." *E.g.*, *United States v. Alviar*, 573 F.3d 526, 540 (7th Cir. 2009). The rule provides that the offered statement "must be considered but does not by itself establish . . . the existence of the conspiracy or participation in it." Fed. R. Evid. 801(d)(2); see also *Bourjaily v. United States*, 483 U.S. 171, 184 (1987) (Stevens, J., concurring) ("a declarant's out-of-court statement is inadmissible against his alleged co-conspirators unless there is some corroborating evidence to support the triple conclusion that there was a conspiracy among those defendants, that the declarant was a member of the conspiracy, and that the statement furthered the objectives of the conspiracy"); Fed. R. Evid. 801(d)(2), 1997 Advisory Comm. Note ("It provides that the contents of the declarant's statement do not alone suffice to establish a conspiracy in which the declarant and the defendant participated. The court must consider in addition the circumstances surrounding the statement, such as the identity of the speaker, the context in which the statement was made, or evidence corroborating the contents of the statement in making its determination as to each preliminary question.") (collecting cases). The district court's determination that a statement is admissible under the co-conspirator exemption is ordinarily reviewed under a clearly erroneous standard. See *United States v. Westmoreland*, 312 F.3d 302, 309 (7th Cir. 2002). Where, as here, however, the proponent of the evidence did not have an opportunity to be heard on the point in the district court, it is only fair that we consider the issue *de novo*.

Smith argues that Bray and Bianchetta conspired to retaliate against him after he complained about discrimination. Although this is not the sort of undertaking the word "conspiracy" normally brings to mind, Rule 801(d)(2)(E) encompasses a broad definition that goes well beyond the more confined concept of criminal conspiracy. See, *e.g.*, *United States v. Kelley*, 864 F.2d 569, 573 (7th Cir. 1989) ("Rule 801(d)(2)(E) applies not only to conspiracies but also to joint ventures, and . . . a charge of criminal conspiracy is not required to invoke the evidentiary rule."); *United States v. Coe*, 718 F.2d 830, 835 (7th Cir. 1983) ("Conspiracy as an evidentiary rule differs from conspiracy as a crime. The crime of conspiracy comprehends much more than just a joint venture or concerted action, whereas the evidentiary rule of conspiracy is founded on concepts of agency law. Recognizing this, some courts refer to the co-conspirator exception as the 'joint venture' or 'concert of action' exception.") (internal citations omitted), citing *United States v. Gil*, 604 F.2d 546, 549 (7th Cir. 1979); see also *United States v. Gewin*, 471 F.3d 197, 201 (D.C. Cir. 2006) ("[T]he rule, based on concepts of agency and partnership law and applicable in both civil and criminal trials, embodies the long-standing doctrine that when two or more individuals are acting in concert toward a common goal, the out-of-court statements of one are admissible against the others, if made in furtherance of the common goal.") (internal quotations and ellipsis omitted). The conspiracy Smith alleges — that Bray and Bianchetta acted in concert toward the goal of getting him fired — would qualify for the purposes of the co-conspirator exemption.

The decisive question is whether Smith has identified any admissible evidence substantiating the existence of this conspiracy outside of Bianchetta's "we're-gonna-get-you" hearsay statement itself. Smith's best evidence on this point is his deposition testimony about what Bray told him after he repeatedly called and paged her during his leave to talk about his health insurance: "Well, I'm not going to discuss this, and I told you before that if Jim [Bianchetta] is not going to talk to you I'm not going to talk to you." Smith Dep. 169. This testimony is admissible against Bray as a statement by a party opponent. See Fed R. Evid. 801(d)(2)(A).

We do not think this testimony shows that Bray conspired with Bianchetta to retaliate against Smith for his complaints of discrimination. In a corporation or other business or institution, one should expect to find some concerted action among people with different responsibilities who are expected to work together, like supervisors and human resources staff. In a case of individual liability, evidence of that legitimate concerted action should not be interpreted too easily as evidence of a conspiracy so that one person's admission of an unlawful motive is attributed to another. The point is parallel to criminal liability for conspiracy, where the government must prove that the defendant agreed to or shared the common criminal purpose of other conspirators. For example, "because the crime of conspiracy requires a concert of action among two or more persons for a common purpose, the mere agreement of one person to buy what another agrees to sell, standing alone, does not support a conspiracy conviction." *United*

*States v. Kimmons*, 917 F.2d 1011, 1015-16 (7th Cir. 1990), quoting *United States v. Mancillas*, 580 F.2d 1301, 1307 (7th Cir. 1978); see also *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1191 (2d Cir. 1989) ("In order to support a conviction for conspiracy, the evidence must be sufficient to permit the jury to infer that the defendant and other alleged coconspirators entered into a joint enterprise with consciousness of its general nature and extent. When a conspiracy has been charged, the alleged coconspirators' actions may be assessed in light of their interrelationship and inter-dependency as well as the nature and duration of the enterprise. Though accidentally parallel action is not enough to establish a conspiracy, and a mere buyer-seller relationship is not necessarily a conspiracy, a defendant may be deemed to have agreed to join a conspiracy if there is something more, some indication that the defendant knew of and intended to further the illegal venture, that he somehow encouraged the illegal use of the goods or had a stake in such use.") (internal citations and quotation marks omitted). In the terms of Seventh Circuit Pattern Criminal Jury Instruction § 5.08: "The government must prove beyond a reasonable doubt that the defendant was aware of the common [criminal] purpose and was a willing participant." See *United States v. Stotts*, 323 F.3d 520, 522 n.1 (7th Cir. 2003).

In this civil case, of course, Bray need not meet the beyond-reasonable-doubt standard. Even under the preponderance-of-the-evidence standard, however, Bray's refusal to talk with Smith falls short of proving that she was aware of any unlawful motive of

Bianchetta's. It may show some concert of action between Bianchetta and Bray, but it does not indicate that they shared a common unlawful motive. We can assume that Bianchetta and Bray were working together on issues involving Smith's performance and employment and agreed he should be fired, at least after the long unexcused absence from work. That is to be expected between human resources staff and supervisors in the corporate or other institutional setting. In light of their "interrelationship and interdependency" at Equistar, *Beech-Nut Nutrition Corp.,* 871 F.2d at 1191, Bianchetta and Bray's parallel action here is not enough to show she shared Bianchetta's unlawful purpose. When it comes to individual liability for retaliation, Smith needed evidence, beyond Bianchetta's statements, that would allow a reasonable jury to find that Bray knew about and shared Bianchetta's retaliatory motive. Bray's refusal to talk with Smith simply does not do so.[7]

---

[7] Smith's two other admissible pieces of evidence of the conspiracy between Bray and Bianchetta are even weaker. First, there is the deposition testimony of Jason Cornelio, who worked in the same unit with Smith, that Bianchetta said that Bray had told him that if Smith "leaves and you don't authorize him leaving he's fired. It's job abandonment." Smith argues that this testimony corroborates Bianchetta's threat that he and Bray had already decided to fire Smith and thereby provides further proof that they were working together to retaliate against him. That might be true if Bray herself had made this statement to Cornelio, but this testimony was also hearsay filtered through Bianchetta. It does no work

(continued...)

## 2. *Other Causation Evidence*

The rest of Smith's evidence is also too thin to support a reasonable inference that Bray harbored a retaliatory motive. Smith asserts that unlawful animus may be inferred from Bray's ignoring his complaints of discrimination. If Bray had stood idly by while Smith complained to her of race discrimination, this might provide evidence of her own discriminatory animus. Cf. *Nanda v. Moss*, 412 F.3d 836, 843 (7th Cir. 2005) (in § 1983 discrimination suit, affirming denial of qualified immunity to university dean who "completely ignore[d] each of the complaints" about discrimination the plaintiff had

---

(...continued)

independent of the Bianchetta threat itself in implicating Bray in a plot against Smith. Although the court may consider inadmissible evidence in assessing a proffered co-conspirator statement, see *Bourjaily v. United States*, 483 U.S. 171, 178 (1987), the same reliability concerns animating the hearsay rule may make certain hearsay statements insufficient to support proof of the existence of a conspiracy.

Second, Smith points to Bray's admission that she spoke to Bianchetta about Smith's medical leave benefits application, arguing that this shows they were "coordinating with one another following Smith's sick leave." The fact that Bray told Bianchetta that Concentra was managing Smith's disability claim does nothing to suggest the existence of an unlawful conspiracy between them. Rather, providing that sort of information is precisely the kind of conversation one would expect to occur routinely between human resource managers and supervisors.

made against the department head); *Hildebrandt v. Illinois Dep't of Natural Resources*, 347 F.3d 1014, 1039 (7th Cir. 2003) (supervisors who "turn a blind eye" to discrimination by subordinates may be personally liable under § 1983), quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). In this case, however, Smith has not identified a specific instance in which he complained about discrimination and Bray failed to act on it.[8] Without evidence that Smith complained about

---

[8] Smith alleges more generally that he "complained directly to Bray about the discrimination and harassment" and that "Bray ignored Smith's complaints." None of his record citations support this assertion, however. In his deposition, Smith testified that he had complained to Bray about Hieser "not doing his job" but did not indicate that he had described Hieser's harassment as racially-motivated. Smith Dep. 38. Although Bray's characterization of Hieser as an "equal opportunity picker" suggests that Smith had accused Hieser of racial harassment, Smith's own testimony indicates that his complaint to Bray was related to Hieser's work rather than discrimination. When Bray asked Smith if he had called Hieser a "racist bigot m***** f******," Smith denied it, and both in conversation with her and at his deposition he attributed that comment to another employee. Smith Dep. 45-46. A defendant can be held liable for retaliation only if she knew the plaintiff engaged in protected activity. See *Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1122 (7th Cir. 2009). A vague gripe about a co-worker does not count as statutorily protected expression. See *Durkin v. City of Chicago*, 341 F.3d 606, 615 (7th Cir. 2003). Evidence that Bray ignored Smith's complaint about

(continued...)

discrimination directly to Bray, or that she even knew about any particular complaint he might have made, it is impossible to conclude that she ignored him at all, let alone to infer that a discriminatory animus motivated her deliberate indifference. See, *e.g.*, *Morfin v. City of East Chicago*, 349 F.3d 989, 1005 (7th Cir. 2003) ("The protected conduct 'cannot be proven to motivate retaliation if there is no evidence that the defendants knew of the protected activity.'") (brackets omitted), quoting *Stagman v. Ryan*, 176 F.3d 986, 1000-01 (7th Cir. 1999).

Smith also argues that evidence of Bray's unlawful motive may be found in both her failure to return his

---

(...continued)

Hieser's supposed incompetence does not provide evidence that she harbored an unlawful animus.

Smith can point to evidence that he reported discrimination to other employees, including Jim Arrajj, the unit superintendent, and Joy Nixon, another human resources employee. Arrajj testified that someone with "the HR group" showed him a four-page discrimination complaint that Smith lodged against Bianchetta, but that he did not remember which employee it was. Arrajj Dep. 19. Nixon testified that Smith complained about discrimination to her several times, and that she passed on all his complaints to Bray. Nixon Dep. 51-52. Nixon did not identify a specific occasion on which she reported a complaint of Smith's to Bray, nor did she state what response Bray took or whether and for how long Bray delayed in responding. At the summary judgment phase, Nixon's testimony is enough to show that Bray knew Smith had complained about race discrimination, but it does not show that she received a particular complaint and refused to address it.

telephone calls during his disability leave and her state-
ment to Smith that if Bianchetta "is not going to talk to
you, I'm not going to talk to you." We do not see how
either of these suggests that Bray wished to retaliate
against Smith for complaining about discrimination.
Her failure to call him back may have stemmed from
any number of causes, from innocent forgetfulness to
willful spite; friends and family breach etiquette in
this way as regularly as workplace nemeses do. And
while her refusal to speak to Smith because Bianchetta
would not may have been petty or unwise, we would
have to depend on speculation to conclude that it was
a response to Smith's protected activity. It shows at
most a concert of action between Bray and Bianchetta,
but it does not indicate that she shared his retaliatory
motive.

Finally, Smith argues that the short gap (a few months)
between his complaints about discrimination and his
termination shows "suspicious timing" suggesting that
Bray had a retaliatory motive. Coupled with cor-
roborating evidence of retaliatory motive, evidence of
"suspicious timing . . . can sometimes raise an inference
of a causal connection," but it is "rarely sufficient" by
itself. *Coleman*, 667 F.3d at 860, quoting *Magyar v. St. Joseph
Regional Medical Center*, 544 F.3d 766, 772 (7th Cir. 2008),
and *O'Leary*, 657 F.3d at 635. As explained above, Smith
has presented no other admissible evidence of Bray's
retaliatory intent. This is therefore not a case in which a
"sequence of protected activity and punitive action could
lend . . . support to a[n] . . . inference of retaliation."
*Coleman*, 667 F.3d at 861.

In sum, Smith's retaliation claim does not satisfy the causation element of the direct method because he did not present sufficient circumstantial evidence showing that his complaints about discrimination motivated Bray to seek his termination.

Finally, the district court correctly granted summary judgment for Bray on Smith's constructive discharge claim. A constructive discharge occurs when working conditions become so unbearable that an employee is forced to resign. We agree with the district court that "Smith's alternative claim that he resigned in June 2006 is in direct conflict with the evidence" showing that he was fired. "We can make it no plainer than to reiterate that constructive discharge 'refers to a situation in which an employee is not fired but quits.'" *Jordan v. City of Gary*, 396 F.3d 825, 837 (7th Cir. 2005), quoting *McPherson v. City of Waukegan*, 379 F.3d 430, 440 (7th Cir. 2004). As in *Jordan*, where the plaintiff acknowledged being "terminated because she failed to return to work as ordered after . . . being absent without leave," *id.* at 836, Smith does not dispute that he was fired. His constructive discharge claim therefore fails.

AFFIRMED.