In the

# United States Court of Appeals

### For the Seventh Circuit

No. 12-1713

NANCIE J. CLOE,

*Plaintiff-Appellant,*

*v.*

CITY OF INDIANAPOLIS,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 10-cv-1070—**William T. Lawrence**, *Judge.*

ARGUED OCTOBER 12, 2012—DECIDED APRIL 9, 2013

Before KANNE, TINDER, and HAMILTON, *Circuit Judges.*

KANNE, *Circuit Judge.* Nancie J. Cloe started working for the City of Indianapolis in April 2007. In March 2008, she was tragically diagnosed with multiple sclerosis ("MS"), a chronic, incurable neurological disorder that rendered her disabled and significantly impaired her day-to-day life. On June 29, 2009, the City terminated her, ostensibly for poor performance. Cloe sued under the Americans with Disabilities Act ("ADA"), 42 U.S.C.

§ 12101 *et seq.*, alleging that the City (1) discriminated against her because of her disability; (2) failed to reasonably accommodate her disability; and (3) retaliated against her for requesting accommodations for her disability. The district court granted summary judgment in favor of the City. For the reasons that follow, we affirm the district court's judgment on Cloe's reasonable accommodation claims, but reverse on her discrimination and retaliation claims.

## I. BACKGROUND[1]

On May 1, 2007, the City of Indianapolis's Department of Metropolitan Development hired Nancie J. Cloe to work as an Unsafe Buildings/Nuisance Abatement Project Manager. Cloe's initial supervisor was Jennifer Greene, the Assistant Administrator of the Division of Community Economic Development. Wendy Cooper, a Senior Project Manager, became Cloe's supervisor shortly thereafter.

One of Cloe's responsibilities was to arrange multiagency sweeps of abandoned, derelict, and unsafe properties. This job required Cloe to coordinate various city agencies, including the police department, animal control, and code enforcement. It also required a lot of

---

[1] Because this is an appeal from an entry of summary judgment, we have construed all of the facts in the light most favorable to Cloe. *See Arizanovska v. Wal-Mart Stores, Inc.*, 682 F.3d 698, 702 (7th Cir. 2012).

field work. During a sweep, Cloe would walk the neighborhood and talk with members of the community about their needs and concerns. Cloe would then monitor the agencies and write reports about their progress. Cloe also responded to neighborhood complaints about derelict buildings and performed preliminary, walk-around inspections of abandoned structures. By all accounts, Cloe had a knack for field work—she received positive performance reviews and several community outreach awards from City leaders.

In March 2008, less than a year after she was hired, Cloe was diagnosed with MS. After Cloe received her MS diagnosis, her doctor ordered Cloe to take time off from work, in part because of the sometimes-debilitating nature of Cloe's disease. Cloe returned to work in late April 2008 but could only work 2-3 days a week and was restricted to desk duty. In May 2008, her doctor lifted some of Cloe's restrictions and allowed her to work 3-4 days a week of desk duty. Because Cloe's condition made it difficult for her to walk, her doctor also asked that Cloe be provided nearby parking and a personal printer. Before Cloe was diagnosed with MS, her job involved about 70% field work and 30% office work. Under her doctor's restrictions, however, Cloe's job became almost entirely desk-bound. Even after returning to work, Cloe continued to suffer the effects of her condition, including difficulty walking, vision impairment, memory problems, difficulty concentrating, and poor spelling and grammar. Cloe also suffers from attention deficit hyperactivity disorder, panic attacks, fibromyalgia, and hypertension. According to

Cloe, these conditions also impair her memory and ability to concentrate.

Starting in June 2008, Cloe began having trouble with her supervisor. On June 26, 2008, Cooper ordered Cloe not to attend a sweep scheduled for the following day because she believed it was a risk to Cloe's health. Cloe attended anyway, and Cooper issued her a written disciplinary action for insubordination. Cloe attributed the incident to miscommunication, and Cooper's overall review of Cloe's performance at the end of the year remained positive.

In late 2008, the City restructured its approach to abandoned housing. As part of the restructuring, Cloe's old job duties were divided among various new positions. Cloe accepted one of those positions on January 5, 2009, and became the "Boarding Manager." On the same day, Michelle Winfield, the Unsafe Buildings Manager, became Cloe's new supervisor.

After Winfield became Cloe's supervisor, things quickly went downhill. On January 26, 2009, Winfield assigned Cloe a large research project to be finished by 5:00 p.m. on January 29, 2009. On January 27, 2009, Cloe requested leave under the Family and Medical Leave Act for January 29 and January 30. Winfield approved the requests, but she also reminded Cloe of the January 29 deadline and offered to help Cloe meet the deadline if necessary. Cloe assured Winfield that she would finish the project on time. The following day, January 28, Winfield again reminded Cloe of the deadline and offered to help her meet it. Cloe again declined

and said she could finish the project on her own. Later that day, however, Winfield's supervisor, Janna Mays, contacted Cloe directly and told her the deadline had been pushed back several days. Cloe assumed that Winfield had been told the same thing and informed Winfield that she would not be able to finish the project by January 29. As a result, on February 2, 2009, Winfield issued Cloe a written disciplinary notice for poor work performance and failure to perform an assigned duty.

At around the same time, Winfield also started expressing concern with Cloe's written work. Beginning in late 2008, other agencies and vendors started complaining that they could not understand some of Cloe's written communication. At a February 6, 2009 meeting, Cloe, Winfield, and several others discussed a number of issues, including poor spelling, bad grammar, and incorrect addresses on demolition requests. A few days later, Winfield gave Cloe a written Memorandum of Understanding that directed Cloe to double-check and read documents aloud, to have a second person edit her work, and to submit documents for Winfield's review before sending them out.

On April 8, 2009, Cloe received a citizen complaint about an unsafe structure in need of emergency demolition. Cloe called Winfield and asked for permission to inspect the structure that evening. Winfield said no. The following morning, April 9, 2009, Cloe went to the property, took photos, and sent them to the responsible agency. She did not directly request an emergency demolition, though, because she did not think it was her job.

At about 4:00 p.m. that afternoon, Cloe called Winfield to tell her about the property and to ask for permission to attend the demolition. Winfield ordered Cloe not to attend.

Sometime after 5:00 p.m. that day, Winfield discovered that nobody had actually ordered an emergency demolition. Winfield managed to schedule the demolition for that evening, but the City ended up having to pay several hundred dollars in overtime because of the late notice. Although Winfield had forbidden Cloe to attend the demolition, another supervisor told Cloe to contact the neighbors and inform them about the demolition. Cloe drove out to the neighborhood, sat and visited with the neighbors, and watched the preparations for the demolition. Once the demolition started, Cloe left.

A few weeks later—sometime in late April 2009—Cloe met with Winfield and Mays. During the meeting, Cloe told Mays and Winfield that she had to leave early because of a doctor's appointment. Both Mays and Winfield expressed anger that Cloe was leaving early. Approximately one week later, on May 4, 2009, Winfield disciplined Cloe for failing to schedule the April 9 emergency demolition and for later attending the demolition contrary to orders. Winfield also signed a Performance Improvement Plan stating that Cloe's performance was "below expectations," that she had "consistently turned in inaccurate work," and that she had been "dishonest and insubordinate." (R. 46-32 at 10.) On June 11, 2009, Mays issued a Notice of Unacceptable Performance or Conduct. That notice indicated that

"requirements for satisfactory performance [by Cloe] have continued to be unmet" and recommended Cloe's termination. (R. 46-35.) The City accepted the recommendation and terminated Cloe on June 29, 2009. Cloe sued, alleging that the City (1) failed to accommodate her disability; (2) discriminated against her because of her disability; and (3) retaliated against her for requesting accommodations for her disability. The district court granted summary judgment in favor of the City, and Cloe timely appealed.[2]

## II. ANALYSIS

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We review the district court's entry of summary judgment *de novo*, viewing all of the evidence in the light most favorable to the nonmoving party. *Arizanovska*, 682 F.3d at 702. "However, our favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012) (internal quotation marks and brackets omitted). Rather, a genuine issue of material fact exists

---

[2] We heard oral argument in this case at the Indiana University Maurer School of Law. We thank the students, staff, and faculty of the law school for being such gracious hosts; we thank counsel for their fine advocacy; and we thank the parties for their patience.

only if there is enough evidence that a reasonable jury could return a verdict in favor of the nonmoving party. *Id.*

## A. Reasonable Accommodation

We will start with Cloe's reasonable accommodation claims. The ADA requires employers to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]." 42 U.S.C. § 12112(b)(5)(A). In order to establish a prima facie case of failure to accommodate under the ADA, "a plaintiff must show that: (1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability." *Kotwica v. Rose Packing Co.*, 637 F.3d 744, 747-48 (7th Cir. 2011).

The ADA's reasonable accommodation requirement applies only to "known" disabilities. 42 U.S.C. § 12112(b)(5)(A). Thus, "a plaintiff must normally request an accommodation before liability under the ADA attaches." *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 608 (7th Cir. 2012); *see also Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co.*, 201 F.3d 894, 899 (7th Cir. 2000) ("Although there will be exceptions to the general rule . . . the standard rule is that a plaintiff must normally request an accommodation before liability under the

ADA attaches.") (internal citation omitted). Once the employer has been put on notice, the employer must take reasonable steps to accommodate the employee's disability. "'The duty of reasonable accommodation is satisfied when the employer does what is necessary to enable the disabled worker to work in reasonable comfort.'" *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 803 (7th Cir. 2005) (*quoting Vande Zande v. Wis. Dep't of Admin.*, 44 F.3d 538, 546 (7th Cir. 1995)).

Here, Cloe contends that the City failed to reasonably accommodate her by (1) failing to timely provide a nearby parking space; (2) failing to timely provide her with a printer close to her office; and (3) failing to help proofread her work. We address each argument in turn.

*1. Parking space*

Cloe first argues that the City failed to grant her request for a nearby parking space within a reasonable amount of time. The timeline of events for this claim is a little hazy, but, viewed in the light most favorable to Cloe, *see Arizanovska*, 682 F.3d at 702, the evidence suggests as follows:

Cloe worked at the Indianapolis City-County Building located at 200 East Washington Street in downtown Indianapolis. (R. 54-1 at ¶ 4.) When Cloe first started working there, she was assigned parking in a garage at the intersection of Maryland Street and Alabama

Street, about two blocks away.[3] (*Id.* at ¶ 3.) In April 2008, Cloe mentioned to her supervisors that she was having trouble walking from the parking garage. (*Id.* at ¶ 4.) The record does not indicate, however, that she specifically requested an accommodation based on this difficulty. (*Id.*) Because of her difficulties, Cloe started parking at her own expense in a lot catty-corner to the City-County building at the intersection of Market Street and Alabama Street. (*Id.*)

On July 2, 2008, Cloe submitted a list of medical restrictions to the City. (*See* R. 46-18.) The restrictions indicated that "[s]pecified parking is preferred if possible" and that, "[i]f required to park [at] a distance the patient will walk back to office at her own pace." (*Id.* at 3.) In response, the City assigned Cloe to a different lot at Washington Street and Alabama Street, directly across the street from the City-County Building. (R. 54-1 at ¶ 4.) It is unclear exactly when Cloe actually received a parking pass for this lot. Emails sent on October 17, 2008, strongly suggest that Cloe had already been parking at this new location for some time; in one of the October 17 emails, Cloe discussed how she had a hard time finding parking at the new location and that she had tried to contact a City administrator several

---

[3] We have taken judicial notice of—and drawn our distance estimates from—images available on Google Maps, "a source whose accuracy cannot reasonably be questioned, at least for the purpose of determining" general distances. *United States v. Perea-Rey*, 680 F.3d 1179, 1182 n. 1 (9th Cir. 2012) (internal quotation marks and brackets omitted).

times about the problem but was uncomfortable
leaving voicemail messages. (R. 46-23 at 3-4.) A later
affidavit from Cloe, however, states that she did not
receive the pass until "mid October" 2008. (R. 54-1 at ¶ 4.)
Obviously, these two pieces of evidence are in tension,
although perhaps not irreconcilably so. Harmonizing
them in the light most favorable to Cloe, we will assume
that she received the pass sometime in the weeks
leading up to October 17.

On September 24, 2008—while Cloe was waiting to
receive a permit for the lot on Washington Street and
Alabama Street—Cloe's doctor wrote a note stating
that Cloe could not walk long distances and that she
needed to park "at the City County building." (R. 46-22
at 2.) Cloe submitted the note to the City the following
day.[4] (R. 54-1 at ¶ 5.) A series of email exchanges
followed on October 17, 2008. (*See* R. 46-23 at 2-4.) In
those exchanges, Cloe thanked several City employees
for "work[ing] very hard to get me able to park close to
the building." (*Id.* at 3.) However, Cloe also indicated
that there had been a misunderstanding and that the

---

[4] The City claims that Cloe did not actually submit the note
until October 2008 and that she admitted as much in her
deposition. (*See* Appellee's Br. at 13-14.) But the record on this
point is not as clear as the City suggests. While there is
some tension in the record, we do not think that Cloe's dep-
osition testimony directly contradicted her later affidavit
that mentioned the September 25 date. Viewed in the light
most favorable to Cloe, the record supports the inference
that Cloe submitted the note on September 25, 2008.

new lot was not working out—Cloe frequently had to park on the far side of the lot and walk almost a full extra block to work. (*Id.* at 3-4.) A City employee offered to meet to discuss alternative accommodations. (*Id.* at 3.)

A visitor's parking placard for an underground lot immediately below the City-County building became available on November 10, 2008. (R. 46-24.) Cloe received it the following day, along with a special placard allowing her to park at nearby parking meters without paying. (R. 46-1 at 55); (R. 46-25). After a while though, it became clear that these solutions were not adequate either—the visitor's spots and street spots were often full when Cloe needed to park. (R. 46-1 at 55.) Cloe brought the problem to the City's attention at some point in November or December 2008. (*Id.* at 55-56.) In early December 2008, another City employee left his position, and Cloe received the departed employee's permanent underground parking spot. (*Id.*); (R. 54-1 at ¶ 5).

Cloe does not argue that the permanent parking pass she received in December 2008 failed to meet her needs. Instead, Cloe contends that the winding path the City took to get there was unreasonable. There is no reason, she claims, for the City not to have given her a permanent parking spot immediately. The delays, in turn, show that the City did not act reasonably to accommodate her disability.

We respectfully disagree. Reasonable accommodation under the ADA is a process, not a one-off event. The process begins with the employee, who has the initial duty to inform the employer of the disability.

*See Sears*, 417 F.3d at 803-04. Absent special circumstances, like a severe cognitive disability or mental illness, *see Bultemeyer v. Ft. Wayne Cmty. Schs.*, 100 F.3d 1281, 1285-87 (7th Cir. 1996), the employee's initial duty requires that he or she "indicate to the employer that she has a disability and desires an accommodation," *Sears*, 417 F.3d at 803. Here, Cloe mentioned to her supervisors that she was having trouble walking in April, but she never specifically asked them for an accommodation until July 2, 2008. As a result, we think that the accommodation process began, at the earliest, on July 2, 2008, when Cloe submitted a note from her doctor specifically requesting parking accommodations. *See Ekstrand v. Sch. Dist. of Somerset*, 583 F.3d 972, 976 (7th Cir. 2009) ("our cases have consistently held that disabled employees must make their employers aware of any nonobvious, medically necessary accommodations with corroborating evidence such as a doctor's note or at least orally relaying a statement from a doctor," before an employer is required to provide an accommodation).

Upon receiving an accommodation request, an employer is not required to provide the exact accommodation requested. *Sears*, 417 F.3d at 802. Instead, "the ADA obligates the employer to engage with the employee in an interactive process to determine the appropriate accommodation under the circumstances." *Id.* at 805 (internal quotation marks omitted). This process brings the employee and employer together in cooperation to "identify the employee's precise limitations and discuss accommodation which might enable the employee to continue working." *Gile v. United Airlines, Inc.*, 213 F.3d

365, 373 (7th Cir. 2000). "If this process fails to lead to reasonable accommodation of the disabled employee's limitations, responsibility will lie with the party that caused the breakdown." *Sears*, 417 F.3d at 805.

We do not think that the interactive process broke down here. After being informed of Cloe's needs, the City provided her with parking at a lot closer to the building. When that did not work out, it gave her a visitor's pass allowing her to park under the building and another pass allowing her to park on the nearby streets. And when that also did not work out, the City gave her a permanent underground parking spot once one opened up. This is exactly the sort of "interactive process," *id.* at 805, that the ADA calls for. In retrospect, of course, it clearly would have been easier to give Cloe a permanent underground pass at the outset. But that is only clear in retrospect. The City had no way of knowing that its other seemingly reasonable accommodations—a different lot, visitor parking, street parking—would be insufficient. And, more importantly, once the City found out that its proposed accommodations were insufficient, it acted with reasonable speed to come up with new ones. We do not think a reasonable jury could find these efforts unreasonable. As a result, summary judgment was proper on this claim.

### 2. Printer

Cloe next contends that the City took too long to give her a printer in her office. On May 23, 2008, Cloe

requested that the City provide her with an in-office printer to minimize the amount of walking she would have to do. The record is unclear on precisely how long it took for the printer to arrive, but Cloe's deposition testimony indicates that it was somewhere between two weeks and one month. During that time, a supervisor had to approve the request, and the City eventually had to take a printer away from another employee to give it to Cloe.

Cloe argues that the City could have bought a new printer or temporarily loaned one to her instead, and the City's failure to do so was unreasonable. But these arguments are problematic. It is unclear whether the City actually could have loaned her a temporary printer—the fact that Cloe's printer eventually had to be taken from someone else suggests that the City did not have a lot of extra printers lying around. As for buying a new printer, a responsible government is entitled to take time to evaluate alternatives before spending taxpayer money. In any event, "[i]t is the employer's prerogative to choose a reasonable accommodation; an employer is not required to provide the particular accommodation that an employee requests." *Id.* at 802. The question, therefore, is not whether the City could have chosen another reasonable accommodation, but rather whether the City's chosen accommodation was reasonable, in light of all of the facts. We do not think a reasonable jury could find that the delay here in tracking down a new piece of equipment was unreasonable. As a result, summary judgment was proper on this claim as well.

*3.  Proofreading help*

Finally, Cloe argues that her mistake-prone written work was, in part, a symptom of her disability. The City, she further argues, did not provide enough help with proofreading her work. While Winfield did require Cloe to submit her work for proofreading, Winfield was rarely around, and so Cloe was rarely able to get her work double-checked. Without this proof-reading, Cloe's written work remained uncorrected and eventually became one of the City's reasons for her termination.

This claim cannot succeed, however, because Cloe has not provided any evidence that she asked for an accommodation regarding her written work. As dis-cussed, an employee generally has an initial duty to tell her employer that she needs an accommodation. *See Fleishman*, 698 F.3d at 608; *Sears*, 417 F.3d at 803. Here, nothing in the record indicates that Cloe ever told the City that her poor written work was related to her disability or that she required an accommodation for it. Nor does Cloe argue that a mental disability or some other condition, *see Bultemeyer*, 100 F.3d at 1285-87, excused her from her duty to ask for an accommodation. As a result, summary judgment was proper on this claim, too.

*B.  Retaliation*

We turn next to Cloe's claim that the City retaliated against her. In addition to requiring reasonable accom-

modations, the ADA also protects employees from being retaliated against for asserting their ADA rights. 42 U.S.C. § 12203(a). A plaintiff may proceed under either the "direct" or "indirect" method of proof to establish a retaliation claim. *Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011). Cloe has chosen to proceed under the direct method. (*See* Appellant's Br. at 21.) Accordingly, she must show that (1) she engaged in a statutorily protected activity; (2) she suffered an adverse action; and (3) there is a causal connection between the two. *See Dickerson*, 657 F.3d at 601. Both sides agree that Cloe engaged in protected activity (requesting accommodations for her disability) and that she suffered an adverse employment action (termination). The question, then, is whether a reasonable jury could infer a causal link between the two.

We think so. To show causation under the direct method, Cloe must provide evidence that her requests for accommodations were a "substantial or motivating factor" for her termination. *Smith v. Bray*, 681 F.3d 888, 900 (7th Cir. 2012). The easiest way to do that is to present a direct admission of retaliatory motive. *See Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012). For obvious reasons, that sort of admission is rare, and it did not happen here. The other way to show causation is "by presenting a convincing mosaic of circumstantial evidence that would support the inference that a retaliatory animus was at work." *Bray*, 681 F.3d at 901 (internal quotation marks omitted). The pieces of that mosaic generally fall into three categories. *Id.* The first includes

"suspicious timing, ambiguous statements oral or written, and other bits and pieces from which an inference of retaliatory intent might be drawn." *Id.* (internal ellipsis omitted). The second is "evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently." *Id.* And the third is "evidence that the employer offered a pretextual reason for an adverse employment action." *Id.*

Viewing the evidence in the light most favorable to Cloe, we think that a reasonable jury could infer a causal link between her termination and her exercise of her ADA rights. A supervisor recommended Cloe's termination on June 11, 2009, (R. 46-35), and the City accepted that recommendation the June 29, 2009, (R. 46-36). For reasons that escape us, the City's motion for summary judgment did not explain who decided to terminate Cloe and why he or she did so. The "Personnel Action Request" that apparently terminated Cloe does not specify the reason for her termination; instead, it instructs the reader to "see attached documentation" that the City did not provide. (*Id.*) Nevertheless, we think it reasonable to infer that Winfield's May 4, 2009 discipline of Cloe played a significant part.

That discipline arose from Cloe's actions during the emergency demolition on April 9, 2009. And that discipline was fishy, if Cloe's evidence is to be believed. To begin, there is at least some evidence that the discipline was unwarranted—while Winfield described Cloe's actions on April 9 as insubordinate, Cloe presented

evidence that she was simply following orders from another supervisor. Moreover, there is evidence that the discipline may have been motivated by hostility towards Cloe's disability. About a week before the May 4, 2009 discipline, Cloe

> had a meeting with Winfield and Janna Mays in which [she] told Winfield and Mays that [she] had to leave early because [she] had a doctor's appointment. Winfield and Mays expressed anger at [Cloe] for having to leave early. Within a week after this incident, when Winfield's supervisor Mays returned from her honeymoon, [Cloe] was written up for the [April 9, 2009 demolition].

(R. 65-2 at 1.)[5] These comments echo other comments about Cloe's disability. Starting as early as January 2009, Winfield (and Jennefer Fultz, the Department Administrator) had played down the seriousness of Cloe's condition. According to Cloe's affidavit, Fultz "made the following comment to me: 'you are fine. I have a friend who has MS and does everything.' Michelle Winfield . . . likewise made similar comments in which she indicated that my medical condition was not serious and did not affect my ability to work." (*Id.*) While none of these comments explicitly admits retaliatory intent, a

---

[5] The City argues that there is no direct evidence that the medical appointment at issue was disability-related. That is true, but we think it is fair to infer as much at the summary judgment stage, particularly given the wide range of symptoms of Cloe's condition.

reasonable jury could certainly read them as evidence of hostility towards Cloe's accommodation requests.

Finally, the timing of the discipline itself was suspicious. And, while suspicious timing will rarely suggest a causal connection on its own, it can form part of a "convincing mosaic" when it is paired with other circumstantial evidence. *Harper*, 687 F.3d at 308; *Bray*, 681 F.3d at 901. We think that is the case here. Cloe's alleged misconduct happened on April 9, 2009, but she was not actually disciplined until May 4, 2009. That month-long lapse of time contrasts with prior disciplinary write-ups. When Cloe did not finish her January 29, 2009 project on time, for instance, she was disciplined just a few days later on February 2, 2009. Furthermore, the suspicious May 4 discipline took place only about a week after Winfield and Mays expressed anger at Cloe leaving for a medical appointment. That close temporal connection, combined with all of Cloe's other evidence, could support an inference that Cloe's need for medical accommodations—and not her actions on April 9—was the real reason behind her discipline and termination. Taken together, we think that Cloe has provided enough evidence of "suspicious timing," "ambiguous statements," and "other bits and pieces from which an inference of retaliatory intent might be drawn" to convince a reasonable jury. *Bray*, 681 F.3d at 901. Accordingly, we think that Cloe has made enough of a showing to avoid summary judgment on her retaliation claim.

*C. Discrimination*

Finally, we turn to Cloe's claim for discriminatory termination under the ADA. The City argues that Cloe has not provided enough evidence of discrimination to survive summary judgment. Cloe argues that the City forfeited this argument by failing to raise it in the district court.[6] The district court agreed with the City. After carefully reviewing the record, we think that Cloe has the better argument.

The ADA forbids employers from discriminating against disabled employees. 42 U.S.C. § 12112(a). There are two ways of proving a discrimination claim under the ADA: the "direct" method and the "indirect" method. *Dickerson*, 657 F.3d at 601. Cloe chose to proceed under the indirect method in the district court, (R. 54 at 12), and in her opening brief in this court, (Appellant's Br. at 15). Under this method, Cloe must first establish a prima facie case of discrimination by

---

[6] The parties frame their case in terms of waiver, but we think forfeiture more accurately describes what is at issue here. Our cases have sometimes blurred the distinction between waiver and forfeiture. *See Alioto v. Town of Lisbon*, 651 F.3d 715, 719 n.1 (7th Cir. 2011) ("Consistent with our precedent, we use the word waive, although forfeit is perhaps the more accurate term."). Nevertheless, the concepts are distinct. "[W]aiver occurs when a defendant intentionally relinquishes or abandons a known right, whereas forfeiture occurs when a defendant fails to timely assert his rights." *United States v. Gaona*, 697 F.3d 638, 641 (7th Cir. 2012). Accordingly, we will use the term "forfeiture."

showing that (1) she is disabled under the ADA; (2) she was meeting her employer's legitimate employment expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees without a disability were treated more favorably. *Dickerson*, 657 F.3d at 601. "Once a plaintiff has established a prima facie case, the defendant must identify a legitimate, non-discriminatory reason for its employment decision." *Id.* "If the defendant satisfies this requirement, the plaintiff must then prove by a preponderance of the evidence that the defendant's reasons are pretextual." *Id.*

The district court held that Cloe could not show that the City's reasons for firing her were pretextual. However, as Cloe correctly points out, the City did not raise this argument in support of its motion for summary judgment. Indeed, the City's brief in support of summary judgment did not mention wrongful termination *at all*. Instead, the City argued only that it did not discriminate against Cloe when it required her to submit medical certifications. (R. 45 at 21-25.) As a result, Cloe contends that the City forfeited the pretext issue and that it was a mistake for the district court to rule on that basis. *See Anderson v. Gulf Stream Coach, Inc.*, 662 F.3d 775, 783 (7th Cir. 2011) (defendant forfeited argument by failing to raise it in its motion for summary judgment).

We think that Cloe is correct. "As a general matter, if the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the

district court should not rely on that ground in its deci-sion." *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th Cir. 2006); *accord Costello v. Grundon*, 651 F.3d 614, 635 (7th Cir. 2011). There is an exception to this rule: "A district court may enter summary judgment sua sponte on an issue not explicitly argued if the losing party is on notice that she has to come forward with all of her evidence." *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 174 (7th Cir. 2011); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986). But we do not think that this exception applies here. While some of Cloe's arguments in the district court might have also been relevant to the pretext question, (*see, e.g.*, R. 54 at 13) ("the disciplinary action[s] taken against Cloe which led to her termina-tion were fabricated"), Cloe never used the word "pretext" nor couched any of her arguments in "pretext" terms. To the contrary, Cloe argued that she had "established her prima facie case which should be sufficient to avoid summary judgment" and that the City had "not yet articulated a legitimate, non-discriminatory reason for its employment action." (R. 54 at 15.) That language suggests Cloe did not address pretext, at least not fully. After all, a plaintiff does not have to address pretext until the defendant articulates a legitimate, non-discrimi-natory reason for his or her actions. *See Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 679 (7th Cir. 2012). Thus, it is unclear whether Cloe was "on notice," *Kellar*, 664 F.3d at 174, that the district court might decide her case on the basis of pretext. As a result, we think that it was a mistake for the district court to grant summary judg-ment on those grounds.

So what should we do with Cloe's discriminatory termination claim? Cloe insists that we must send the case back to the district court. The City, on the other hand, argues that, even without addressing pretext, we can decide the case because Cloe did not provide enough evidence to support her prima facie case. Specifically, the City contents that Cloe has not shown (1) that her performance was satisfactory, or (2) that similarly situated employees were treated better than her.

Given the path this case took through the district court, we think that a remand is better. While the support in the record for some of Cloe's claims is sparse, the record might look very different without the City's forfeiture. Discovery did not close until after the City moved for summary judgment.[7] If the City had presented its arguments at that time, Cloe might well have provided new evidence to counter them. Perhaps Cloe has other evidence that she simply did not present because it was not relevant to the City's motion. Or perhaps Cloe could have used the still-open discovery period to seek out new evidence to meet the City's objections.

---

[7] The City moved for summary judgment on September 26, 2011. (R. 44.) An October 14, 2011 minute order indicates that discovery was complete as of October 13, 2011. (R. 48.) Another minute order indicates that the parties were still discussing discovery as late as January 9, 2012. (R. 61.) Either way, the record clearly indicates that discovery did not close until after the City moved for summary judgment.

But a "nonmovant is not required to present evidence on an issue not raised by the movant." *Costello*, 651 F.3d at 635. And, as discussed, the City's brief in support of summary judgment did not put Cloe on notice that her discriminatory termination claim would be at issue. As a result, the City's failure to raise its arguments below may have prevented Cloe from fully presenting her evidence. Accordingly, remand is appropriate.

The City raises two arguments to the contrary, but neither is persuasive. First, the City contends that "the vagueness of the Complaint" and "the non-specificity of Cloe's deposition testimony" should excuse the City's forfeiture. (Appellee's Br. at 26.) But the Federal Rules of Civil Procedure have ways of dealing with vague complaints, including motions for a more definite statement, Fed. R. Civ. P. 12(e), and motions to dismiss for failure to state a claim, Fed. R. Civ. P. 12(b)(6). The City declined to use either of these tools, so we do not think that any purported vagueness in Cloe's complaint excuses the forfeiture here.

Second, the City argues that any forfeiture was harmless because Cloe briefed the wrongful termination issue in the district court *despite* the City's waiver. Specifically, Cloe argued that she established a prima facie case of discriminatory termination (even though, as discussed, she did not address pretext). And, the City notes, a district court is free to grant summary judgment on issues not raised by the parties, "so long as the losing party was on notice that she had to come forward with all of her evidence." *Celotex*, 477 U.S. at 326; *accord*

*Kellar*, 664 F.3d at 174. Because Cloe discussed her prima facie case, the City argues that she cannot show prejudice from the City's lack of notice, and she therefore had the functional equivalent of an opportunity to come forward with all of her evidence. As a result, the City concludes that we can affirm based on Cloe's supposed inability to state a prima facie case.

We are not convinced. Cloe relied primarily on forfeiture when discussing her discriminatory termination claims in the district court. (*See* R. 54 at 12-13.) True, she also argued, in an abundance of caution, that she had satisfied her prima facie case. (*Id.* at 13.) But we do not think it fair to hold that fact against her, particularly given that (1) the City failed to move for summary judgment on that basis; and (2) that failure may have denied Cloe the opportunity to place additional evidence of discriminatory termination in the record. We do not know whether Cloe will eventually be able to show a triable issue of fact regarding discriminatory termination. But she deserves the chance make that showing fairly, with notice, and with a full opportunity to present her evidence.

## III.  CONCLUSION

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment on Cloe's reasonable accommodation claims. We REVERSE the district court's grant of summary judgment on Cloe's discrimination and retaliation claims, and REMAND for further proceedings consistent with this opinion. The parties shall bear their own costs of appeal.

HAMILTON, *Circuit Judge*. I join fully in Judge Kanne's opinion for the panel. I write separately to note that the employer's unusual presentation of its motion for summary judgment in this case has highlighted an often overlooked aspect of the *McDonnell Douglas* method of indirect proof of employment discrimination: The plaintiff-employee cannot be expected to identify similarly situated comparators until the employer has identified its decision-maker and articulated its reason for the adverse employment decision.

The three basic steps of the *McDonnell Douglas* method are familiar: (1) the plaintiff-employee offers evidence of a prima facie case, which includes identifying one or more similarly-situated employees; (2) the employer states a legitimate, non-discriminatory reason for its decision; and (3) the plaintiff-employee tries to show the employer's stated reason is a pretext, allowing for an inference of unlawful motive. *E.g.*, *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506-07 (1993), citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).

The odd thing about the employer's motion for summary judgment in this case is that it failed to offer a lawful reason for the employer's decision to fire the plaintiff. The motion also contained no affidavit from any official stating that he or she made the decision to fire the plaintiff and stating the reason for the decision. The motion was therefore flawed from the start. See *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 255 & n.9 (1981) (at second step of *McDonnell Douglas* method, "the defendant must clearly set forth, through

the introduction of admissible evidence, the reasons for the plaintiff's rejection").

In the absence of an identified decision-maker and reason, the plaintiff-employee could not be expected to identify comparator employees — people situated similarly to her but outside the legally protected group. The reason is that the plaintiff cannot know who might have been similarly situated without knowing the identity of the decision-maker and the reason the employer relies upon for the decision.

One case that illustrates this relationship is *Coleman v. Donahoe*, 667 F.3d 835 (7th Cir. 2012). In reversing summary judgment for the employer, we explained that the identity of the decision-maker was important in evaluating proposed comparators. *Id.* at 847-48. We also explained that the employer's stated reason for firing the plaintiff in that case was vital in evaluating whether proposed comparators were truly comparable. *Id.* at 849-50, citing *Eaton v. Indiana Dep't of Corrections*, 657 F.3d 551, 559 (7th Cir. 2011). The identity of the decision-maker and the employer's stated reason for firing the plaintiff can come only from the employer. This logical dependence therefore has implications not only for what is needed in a motion for summary judgment, but also for the sequence of discovery in some employment discrimination cases where the *McDonnell Douglas* method may be used.

This logical dependence of the comparator element of the prima facie case on the identity of the employer's decision-maker and stated reason means that the

intricate steps of what Judge Wood described as *McDonnell Douglas*'s "allemande worthy of the 16th century," *Coleman*, 667 F.3d at 863 (Wood, J., concurring), do not always follow the linear sequence that court opinions usually describe. That is why some other circuits consider comparator evidence at the pretext phase of the *McDonnell Douglas* method rather than as part of the prima facie case. See *Coleman*, 667 F.3d at 859 & n.7, citing *Rioux v. City of Atlanta*, 520 F.3d 1269, 1277 (11th Cir. 2008); *Conward v. Cambridge School Comm.*, 171 F.3d 12, 19, (1st Cir. 1999); Deborah C. Malamud, *The Last Minuet: Disparate Treatment after Hicks*, 93 Mich. L. Rev. 2229, 2293 (1995). We need not sort out these differences in approach for now. The important thing is that we recognize that the comparator analysis, like the pretext analysis, depends on the identity of the decision-maker and the employer's stated reason for making the challenged decision.