# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 08-1947

CAMPION, BARROW & ASSOCIATES, INC., and
MICHAEL A. CAMPION,

*Plaintiffs-Appellants*,

*v.*

CITY OF SPRINGFIELD, ILLINOIS,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 06-3215—**Jeanne E. Scott**, *Judge.*

ARGUED SEPTEMBER 17, 2008—DECIDED MARCH 24, 2009

Before MANION, WOOD, and WILLIAMS, *Circuit Judges.*

WOOD, *Circuit Judge.* The firm of Campion, Barrow &
Associates, led by Dr. Michael Campion, provides psycho-
logical services to police and fire departments in the
central Illinois area. (We refer to both as Campion
unless the context requires otherwise.) For many years,
one of its clients was the City of Springfield. This case
arose when the City decided to terminate its relationship

with Campion and enter into a new agreement with psychologist Dr. Paul Detrick. Campion believes that it did so because of a newspaper article reporting his affiliation with the Illinois Family Institute ("IFI"), an organization with conservative views on such topics as marriage, abortion, homosexuality, and stem cell research. After losing his contract with the City, Campion sued it under 42 U.S.C. § 1983 and state law, asserting that the City had violated his First Amendment right of freedom of association, that it had retaliated against his exercise of his First Amendment right of freedom of speech, and that it had breached its contract with him. The district court granted summary judgment in the City's favor. We conclude that it was correct to do so; while Campion's affiliation with IFI was indeed protected, he has not come forward with enough admissible evidence to support a finding that this affiliation or his speech prompted the City's action. We therefore affirm.

**I**

Campion began providing psychological screening for the City's police and fire departments in 1990. Over the years, he performed these tasks under a series of different contracts. The most recent of those became effective on June 1, 2000. The 2000 contract expressly stated that it "shall automatically renew itself each year thereafter" unless either party provides notice of termination. The agreement also authorized payments from the City to Campion up to a ceiling of $21,000. This did not mean that Campion's compensation was so limited,

however; it just meant that the City Council had to modify the contract periodically to approve additional payments. And indeed, the City Council regularly passed ordinances authorizing greater payments to Campion.

It is difficult to pinpoint the exact moment when the parties' relationship began to unravel, but some or all of the following facts may have made a difference. On April 1, 2003, Timothy Davlin became mayor of Springfield. Davlin thought that pre-employment psychological evaluations were a waste of time and money, and he made no secret of his opinion. Nevertheless, after Davlin asked for an opinion from a City attorney about the necessity of the services, the attorney advised him to continue with them, and Davlin did so.

So matters stood when, on August 24, 2004, the *Illinois Times*, a Springfield newspaper, ran a column written by reporter Dusty Rhodes entitled "Partial Disclosure." The story criticized Campion for failing to disclose on his resume the fact that he had been on IFI's board of directors since 1999. Over the next two months, Rhodes wrote two additional articles discussing Campion, his involvement with IFI, and his work for the City. Shortly after these articles appeared, Alderman Frank McNeil went to Mayor Davlin and said "Hey, this guy's got to go. He's out of touch with the mainstream. He has an absolute right to his conservative views, and we have an absolute right to change reviewers." Most of the rest of Springfield's ten aldermen did not recall seeing Rhodes's column before they were deposed in Campion's lawsuit.

Moreover, Davlin had no recollection of either the column or of McNeil's statement (which, taking the facts in the light most favorable to Campion, we assume was uttered).

McNeil made further efforts to have Campion removed from the City's work. At one point, he recommended possible providers to replace Campion. McNeil inferred from Campion's association with IFI that Campion held extremely conservative views on a number of issues, and he speculated that Campion's personal views might be affecting his decisionmaking process when he performed psychological screenings for the City. Alderman Edwards, who had formerly been chief of the City's Fire Department, shared Davlin's skepticism about the usefulness of the evaluation process. At one point, according to one of Rhodes's articles, Edwards commented "This guy's got no consistency. . . . The people I thought would've been squashed, he passed. I'm just a novice reading this, but if a guy had a beer, he was out."

After the publication of Rhodes's first article, in December 2004, the City Council approved an extension of the Campion contract and additional payments. By January 2005, however, it was hunting for a new psychologist. That search led to Detrick, who charged less per applicant than Campion. On May 17, 2005, the Council passed Ordinance 344-05-05 ("Detrick ordinance") on an emergency basis; that ordinance authorized the execution of a contract with Detrick for the provision of the City's psychological testing services. The use of the emergency procedure eliminated the need for two readings of the

ordinance at two separate council meetings, but it also imposed a requirement of a supermajority of eight of the ten alderman for passage. In fact, the vote was unanimous to enter into the Detrick contract. Most aldermen stated under oath that they did not know why the City was changing psychologists, and that the choice was up to the mayor. Every alderman except McNeil stated that Campion's personal views and political associations were not a factor in their decision to vote for the Detrick ordinance.

After the passage of the Detrick ordinance, the City began referring all applicants to Detrick for testing. It did not give Campion 30 days' written notice that his contract was terminated. What it did instead was to pass an additional ordinance authorizing additional payments to Campion for services previously rendered. After that, Campion filed this action, initially against each individual alderman and the mayor, as well as the City, asserting his First Amendment and breach of contract theories. The district court dismissed the claims against the individual defendants, leaving only the claim against the City at this point; Campion has not challenged that action on appeal. On the City's motion for summary judgment, the district court held that, while Campion's speech was protected, he had failed to demonstrate that his protected activity was a motivating factor in the City's decision to terminate his contract. In addition, the court held, it was the City Council that had final policymaking authority with respect to the decision to enter into the Detrick contract, and Campion failed to show that a significant bloc of aldermen were motivated

by Campion's protected speech or associations. Campion contests all of those findings on appeal. The court declined to exercise supplemental jurisdiction over Campion's contract claim.

## II

In order to prevail on his § 1983 claim, Campion must prove (1) that he was engaged in constitutionally protected speech or associations, and (2) that his protected speech was a motivating factor behind the City's decision to terminate his contract in favor of Detrick. If he can point to evidence supporting both of those propositions, the City would then be entitled to show that it would have taken the same action even in the absence of Campion's exercise of his First Amendment rights. *Samuelson v. LaPorte Community School Corp.,* 526 F.3d 1046, 1053 (7th Cir. 2008); *Spiegla v. Hull,* 371 F.3d 928, 942 (7th Cir. 2004) (plaintiff has the burden of proof on the question whether protected activity was a motivating factor for defendant's retaliatory action). Here, the City concedes that Campion's speech and associations were constitutionally protected. The only question is therefore whether Campion has produced enough evidence to require a trial on the question whether his protected activity was a factor that motivated the City's decision on the contract.

Campion detects three errors in the district court's approach to his case: first, he argues that it erred in concluding that the City Council, rather than Mayor Davlin, had final policymaking authority over the choice of

contractor; second, he argues that he did present enough evidence to survive summary judgment; and finally, he finds fault in the district court's implicit legal conclusion that he could prevail only if a significant bloc of aldermen were motivated by his protected activity. We address these points in turn.

1. *Final policymaking authority.* Campion is trying to hold the City itself liable for the loss of his contract, which he is entitled to do under *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658 (1978). But, as the Supreme Court recently reiterated in the analogous context of a case raising an Equal Protection challenge, "[a] plaintiff stating a similar claim via § 1983 for violation of the Equal Protection Clause by a school district or other municipal entity must show that the harassment was the result of municipal custom, policy, or practice." *Fitzgerald v. Barnstable School Comm.*, 129 S.Ct. 788, 797 (2009). One way that municipal custom, policy, or practice can be shown is by demonstrating a "deliberate choice to follow a course of action . . . from among various alternatives by the official or officials responsible for establishing final policy, with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986). See also *Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 469 (7th Cir. 2001). A person's status as a final policymaker for the purposes of § 1983 is a question of state or local law. *Kujawski v. Bd. of Comm'rs*, 183 F.3d 734, 737 (7th Cir. 1999).

In order to satisfy these standards, Campion is forced to rely on a convoluted argument. It was not the City

Council alone that had final policymaking authority, he suggests; instead, it was a combination of Mayor Davlin and the Council. He contends that Davlin first selected a replacement provider (Detrick); next, the Council, acting in concert with him, enacted the ordinance authorizing the funding for the Detrick contract; and finally, the mayor had to sign the ordinance and contract. This shows, Campion believes, that the Council and Davlin jointly exercised final policymaking authority. The City has a simpler view: it asserts that the Council alone had the final policymaking authority, because under local law, only the Council could authorize the agreement to switch psychologists.

We do not exclude the possibility that the kind of power-sharing arrangement that Campion postulates might exist in some circumstances, either *de jure* or *de facto.* But Campion has not brought forward any evidence that would permit a finding that this was the way Springfield was handling its psychological testing contract. First, the law is against him. Under Illinois law, only the City Council could authorize the agreement to change the contract from one provider to another. See 65 ILCS 5/8-1-7(a); Springfield Municipal Code §§ 31.05, 31.11, 38.35, and 38.44. Any contract over the amount of $15,000 must be approved by the City Council. Springfield Municipal Code § 38.35. Notably, Mayor Davlin did not act unilaterally when he set about changing the contract from Campion to Detrick. Instead, he sought the City Council's consent, implying that he did not have the ability to act by himself. Campion responds that the Detrick contract was not complete until Davlin signed it,

but even that is not quite accurate. Under the municipal code, if the mayor refuses to sign an ordinance (effectively vetoing it), the ordinance can be passed again by two-thirds of all aldermen holding office. After that vote (which was exceeded here, incidentally), the new rule or, as here, testing arrangement, takes effect.

Campion introduced no evidence tending to show that this was not the real process followed by the Council, either in this particular case or as a rule. He thus cannot prevail on the theory that there was an established munici-pal custom giving the mayor the *de facto* power to handle matters like this unilaterally or to impose his wishes on the Council and use it as a rubber stamp.

2. *Insufficiency of evidence.* Campion also complains that the district court erred when it concluded that he "failed to present evidence that Campion's protected activity was a motivating factor for the City Council's decision to switch psychologists." He relies on eight factual asser-tions, which, in his view, support a reasonable inference in his favor. Those assertions are as follows:

- Timing of decision to change contracts in relation to the publication of the Rhodes articles;

- Tumultuous political climate after the City learned of Campion's affiliation with IFI;

- Statements made by Davlin, McNeil, Edwards, and Alderman Strom;

- Evidence indicating that aldermen capitulated to McNeil's and Davlin's unlawful motives;

- Use of the emergency mechanism to pass the ordinance authorizing the Detrick contract;

- Contradictions in Davlin's testimony about his knowledge of Campion's IFI activities;

- Replacement of Campion with Detrick, who is out-of-state and has less experience; and

- Contradictions in testimony of various aldermen about their reasons for replacing Campion.

There are a host of problems with these supposed items of evidence; we touch on only the most important of them. First, there is no evidence in the record indicating that all of the aldermen and Mayor Davlin actually knew about the Rhodes article at the time they acted to pass the Detrick ordinance. To the contrary, the evidence suggests that all but a few were unaware of it. Davlin testified that he did not recall either the article or Alderman McNeil's statement to him about it; other aldermen testified that they had not read the article and that they did not know about Campion's association with IFI when they voted to change psychologists. Campion suggests that everyone is lying, but his suspicions alone are not enough to defeat summary judgment. See, *e.g., Springer v. Durflinger,* 518 F.3d 479, 484 (7th Cir. 2008).

For the same reasons, there is nothing to suggest that the aldermen were capitulating to the preferences of a vocal minority. Campion argues that while not all aldermen were motivated by unlawful retaliation in the decision to approve the Detrick ordinance, the aldermen "understood and capitulated to the unlawful motivation

of others." This means that Campion's theory is that all of the aldermen were consciously willing to acquiesce in the unlawful intent. But Campion's evidence shows instead that most of the aldermen knew nothing about Campion's IFI association or the Rhodes article when they voted on the Detrick ordinance. Notably, Campion does not make the argument that the aldermen merely functioned as the "cat's paw" of those with identifiable retaliatory motive. His failure to develop that point is fatal. If, hypothetically, he had wanted to urge that the Council was functioning as the Mayor's cat's paw, then he would have to contend with the evidence showing that the Mayor's hostility to Campion's testing arrangement significantly predated the first Rhodes article. (The evidence, taken in the light most favorable to Campion, may also show that the Mayor knew about McNeil's bias, but there is nothing to suggest that the Mayor shared that view—indeed, Mayor Davlin himself testified that he did not remember McNeil's comments.) If instead Campion wanted to urge that the Council was capitulating to Alderman McNeil (the most outspoken critic of Campion's IFI affiliation), and him alone, he would need some evidence indicating that both the Mayor and the rest of the Council knew about McNeil's views, or habitually rubber-stamped whatever McNeil wanted. None of that evidence is in the record. This is therefore not a case in which the evidence could support a finding that X (the Council) relied on Y's (the Mayor's or McNeil's) intent, making it permissible to base municipal liability on Y's discriminatory animus.

Furthermore, this record reveals nothing untoward about the use of the emergency procedure for passing

the Detrick ordinance. Although that procedure does permit the Council to dispense with multiple readings of the draft, it also demands a supermajority for passage. Campion introduced no evidence indicating that the Council reserved its emergency procedure for an entirely different kind of bill; for all the record shows, use of the procedure might have been routine. And finally, the timing of the Council's action is too weak a reed to support Campion's case. As we have noted before, "the fact that a plaintiff's protected speech may precede an adverse employment decision alone does not establish causation." *Mullin v. Gettinger,* 450 F.3d 280, 285 (7th Cir. 2006).

We review the district court's evaluation of the evidence for purposes of summary judgment *de novo.* Having done so, we are satisfied that the court correctly assessed the record before it.

3. *Significant bloc analysis.* This part of Campion's challenge focuses on the following passage from the district court's opinion:

> The face of the 2005 [Detrick] Ordinance does not show any discriminatory or retaliatory motivation. The Plaintiffs, therefore, must produce other evidence to show that Campion's protected activity was a motivating factor for a significant bloc of the members of the Council, and the probable complicity of the remaining members of the Council who supported the decision.

The focus on the views of a "significant bloc" was wrong as a matter of law, in Campion's view, and he sees this alleged error as important enough to warrant reversal.

Here, Campion touches on an important subject: how are we to understand the way in which multi-member bodies arrive at their collective decisions? Social choice theory, launched by Kenneth Arrow's leading book, *Social Choice and Individual Values* (2d. ed. 1963), has a great deal to say about this. See, *e.g.,* Tom Ginsburg, *Ways of Criticizing Public Choice: The Uses of Empiricism and Theory in Legal Scholarship,* 2002 U. ILL. L. REV. 1139; Cheryl D. Block, *Truth and Probability—Ironies in the Evolution of Social Choice Theory*, 76 WASH. U. L. Q. 975 (1998). See also Frank H. Easterbrook, *Ways of Criticizing the Court*, 95 HARV. L. REV. 802 (1982), applying public choice theory to the Supreme Court's decisionmaking processes. In *Scott-Harris v. City of Fall River,* 134 F.3d 427 (1st Cir. 1997), a First Circuit decision on which the district court relied, the court of appeals found that the plaintiff failed to introduce enough evidence to support municipal liability in part because her proof showed that only two out of nine members of a city council harbored an unlawful motive. *Id.* at 439. The court criticized the plaintiff for failing to depose the other seven council members. The Supreme Court, however, reversed the First Circuit's decision in *Bogan v. Scott-Harris,* 523 U.S. 44 (1998), on the ground that the legislators were absolutely immune from any suit based on their actions in voting for a particular ordinance. *Id.* at 55-56. This, in our view, cautions sharply against any kind of reliance on "significant bloc" analysis or its like. As Campion rightly argues, what matters are the motives of the legislative body as a whole, not the idiosyncratic views of each legislator. (But that, of course, throws one right back into the complexities of public choice theory.)

Interesting though these questions are, we do not need to spend more time on them. The district court's reference to a "significant bloc" was just one of many points it made along the way to its ruling in the City's favor. We are not bound by that court's characterization of the evidence. The fact remains that Campion failed to introduce anything affirmatively indicating that the authorized decisionmaker—the City Council—was retaliating against him either because of his speech, or because of his association with IFI. The record showed instead that Campion was charging $375 per psychological evaluation, while Detrick was willing to perform the same work for $175 per applicant for pre-employment evaluations and $350 for fitness-for-duty evaluations. Although Campion may have been in the business longer, Detrick testified that he had been conducting these evaluations since approximately 1990, and that he had about 30 clients, all police departments or municipalities. The City renewed Campion's contract in December 2004, four months after the initial Rhodes article was published; the change in psychologists did not happen until the following May. In the face of that evidence, Campion bore a substantial burden to point to something else that might have indicated unlawful action. He has failed to do so.

We therefore AFFIRM the judgment of the district court in favor of the City of Springfield.