William **KREGLER**, Plaintiff,

v.

**CITY OF NEW YORK et al., Defendants.**

**No. 08 Civ. 6893(VM).**

United States District Court, S.D. New York.

Dec. 9, 2013.

Nathaniel B. Smith, Law Office of Nathaniel B. Smith, New York, NY, for Plaintiff.

Christopher Aaron Seacord, Maxwell Douglas Leighton, New York City Law Department, Zev Samuel Singer, Office of The Corporation Counsel, New York, NY, for Defendants.

### DECISION AND ORDER

VICTOR MARRERO, District Judge.

Plaintiff William Kregler ("Kregler" or "Plaintiff") brought this action pursuant to 42 U.S.C. § 1983 ("§ 1983") raising a claim of First Amendment retaliation against the City of New York (the "City") and individual defendants Louis Garcia ("Garcia"), Rose Gill Hearn ("Hearn"), Keith Schwam ("Schwam"), Darren Keenaghan ("Keenaghan"), Brian Grogan ("Grogan"), and Jayme Naberezny ("Naberezny"). The Court granted summary judgment on the claims against Hearn, Schwam, Keenaghan, Grogan, and Naberezny in a Decision and Order dated October 26, 2011. *See Kregler v. City of New York*, 821 F.Supp.2d 651 (S.D.N.Y.2011). Now before the Court is the motion of the remaining defendants—the City and Garcia (collectively, "Defendants")—for summary judgment. For the reasons discussed below, Defendants' motion for summary judgment is GRANTED in part and DENIED in part.

### I. BACKGROUND [1]

In April of 2004, one month after retiring from his position as a Fire Marshal with the City's Fire Department ("FDNY"), Kregler filed a preliminary ap-

---

1. The Court derives the factual summary from (1) the recitation of the pertinent pleadings and other matters of record set forth in the Decision and Order, *see Kregler v. City of New York*, 821 F.Supp.2d 651 (S.D.N.Y.2011); (2) the First Amended Complaint (Dkt. No. 39); (3) Defendants' Local Civil Rule 56.1 State- ment of Undisputed Material Facts, dated October 25, 2013; and (4) Plaintiff's Local Civil Rule 56.1 Opposition Statement of Disputed Facts in Opposition to Motion for Summary Judgment, dated November 29, 2013. Except where specifically referenced, no further citation to these sources will be made.

plication and questionnaire for appointment by the City's Mayor as a City Marshal. Candidates for appointment as City Marshals are subject to an investigation of their personal and financial background by the City's Department of Investigations ("DOI") and also must complete a DOI-administered training program. In January of 2005, Kregler was interviewed by representatives of the Mayor's Committee on City Marshals and was later notified by Schwam, an Assistant Commissioner at DOI, that DOI would commence its personal and financial review of Kregler's background. As a follow-up, Kregler met in April of 2005 with Keenaghan, a DOI investigator, to discuss Kregler's preliminary application. Kregler then made minor modifications to the application, signed the revised form, and provided authorizations for release of his personal information.

On May 25, 2005, Kregler, in his capacity as President of the Fire Marshals Benevolent Association, publicly endorsed the candidacy of Robert Morgenthau ("Morgenthau") for reelection as District Attorney for New York County. At that time, all other law enforcement associations in the City supported Morgenthau's opponent, Leslie Crocker Snyder ("Snyder"). An article that appeared in a June 2005 edition of *The Chief,* a local newspaper, reported on Kregler's endorsement of Morgenthau. Grogan, an FDNY Supervising Fire Marshal, posted a copy of that article in a public area within one of the FDNY offices. Kregler alleges that Grogan then "berated" him for the endorsement, stating: "[W]ho the f___ do you think you are. Louie [Garcia] makes the endorsement." (Compl. ¶ 29.) At the time of that incident, Garcia was the Chief Fire Marshal of the FDNY's Bureau of Fire Investigation. Both Garcia and Grogan supported Snyder's political campaign against Morgenthau.

On July 7, 2005, Kregler was interviewed by staff of the Mayor's Office in connection with his City Marshal application. The following day Schwam told Kregler that the next step in the process would be the completion of the DOI background check. To that end, Kregler met a second time with Keenaghan, the DOI investigator, to update and refile his application. In September of 2005, Schwam invited Kregler to begin the DOI training classes, which Kregler successfully completed. In November of 2005, Kregler satisfied the last requirement for appointment by demonstrating his ability to obtain a bond. In March of 2006, Kregler was informed by letter from Schwam that he would not be appointed as a City Marshal.

Kregler filed this action in August of 2008, raising a claim of First Amendment retaliation in violation of § 1983. Kregler contends that the explanation proffered to him for the denial of his application—Kregler's failure to disclose details of a Command Discipline he had received in 1999 during his employment by the FDNY—was merely a pretext for Garcia's unlawful retaliation. Kregler alleges that Garcia was "personally and socially acquainted" with Naberezny, the Inspector General for the DOI (Compl. ¶ 40), and that the two "agreed to cause Kregler's application for appointment as a City Marshal to be rejected by DOI in retaliation for Kregler's support of Morgenthau." (Compl. ¶ 43.)

## II. *LEGAL STANDARDS*

### A. *SUMMARY JUDGMENT*

In connection with a Rule 56 motion, "[s]ummary judgment is proper if, viewing all the facts of the record in a light most favorable to the non-moving party, no genuine issue of material fact remains for adjudication." *Samuels v. Mockry,* 77 F.3d 34, 35 (2d Cir.1996) (*citing Anderson*

*v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The role of a court in ruling on such a motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986).

The moving party bears the burden of proving that no genuine issue of material fact exists, or that due to the paucity of evidence presented by the non-movant, no rational jury could find in favor of the non-moving party. *See Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1223 (2d Cir.1994).

### B. *FIRST AMENDMENT CLAIM*

■ To succeed on his First Amendment retaliation claim under § 1983, Kregler must show that: (1) he engaged in constitutionally protected speech; (2) he suffered an adverse employment action; and (3) a causal connection exists between the speech and the adverse employment action "so that it can be said that the speech was a motivating factor in the determination." *Washington v. County of Rockland,* 373 F.3d 310, 320 (2d Cir.2004) (*citing Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir.1999)).

#### 1. *Individual Actors*

■ It is well settled in the Second Circuit that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (*quoting Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). "Personal involvement," however, is not limited to direct participation in the deprivation of rights at issue. Kregler may show the personal

involvement of Garcia in several ways, such as by: (1) directly participating in the infraction; (2) failing to remedy the wrong after learning of the violation; (3) creating a policy or custom under which unconstitutional practices occurred or allowing such a policy or custom to continue; (4) being grossly negligent in managing subordinates who caused the unlawful condition or event; or (5) exhibiting "gross negligence" or "deliberate indifference" to the constitutional rights of Kregler by having actual or constructive notice of the unconstitutional practices and failing to act. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *see also Wright,* 21 F.3d at 501.

#### 2. *Municipal Liability*

■ Municipal entities are "persons" within the meaning of § 1983 and therefore subject to suit under that provision. *Monell v. Department of Soc. Servs.,* 436 U.S. 658, 663, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107, 128 (2d Cir.2004). But municipalities are not liable "on a *respondeat superior* theory," simply because an employee committed a tort. *Monell,* 436 U.S. at 691, 98 S.Ct. 2018. Section 1983 "distinguish[es] acts of the *municipality* from acts of *employees* of the municipality," and imposes liability only for "action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati,* 475 U.S. 469, 479, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (emphasis in original).

■ The municipality is responsible if a violation of an individual's rights resulted from the "government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell,* 436 U.S. at 694, 98 S.Ct. 2018. When "'an official has final authority over significant matters involving the exercise of discre-

tion, the choices he makes represent government policy.'" *Clue v. Johnson*, 179 F.3d 57, 62 (2d Cir.1999) (*quoting Rookard v. Health & Hosps. Corp.*, 710 F.2d 41, 45 (2d Cir.1983)). As a result, "municipal liability may be imposed for a single decision by municipal policymakers." *Pembaur*, 475 U.S. at 480, 106 S.Ct. 1292.

## III. *DISCUSSION*

### A. *CLAIMS AGAINST GARCIA*

Kregler advances the theory that the personal relationship between Naberezny and Garcia provided the impetus for their alleged collusion to cause the denial of Kregler's application for City Marshal in retaliation for supporting Morgenthau.

Defendants argue that summary judgment should be granted as to Garcia on two main grounds: first, that plaintiff cannot establish a *prima facie* case of First Amendment retaliation, and second, that Garcia is entitled to qualified immunity.[2] (Defs.' Mem. Supp. Mot. Summ. J. ("Defs.' Mem."), at 5, 12 (Dkt. No. 139).)

### 1. *Factual Basis for Retaliation Claim*

■ Kregler argues that it is premature for the Court to decide the issue of Garcia's involvement in the adverse employment decision without providing Plaintiff an opportunity to demonstrate causation at trial. The Court agrees. Whether or not Kregler's arguments regarding Garcia's liability will prove meritorious, the Court cannot conclude at this point that the claim against Garcia fails as a matter

of law. There are disputed issues of material fact that, if viewed in the light most favorable to Kregler, suggest that Garcia may have been the causal link between the adverse employment action and Kregler's constitutionally protected speech.

Defendants argue that Kregler lacks any relevant evidence to suggest that Garcia, possessing a retaliatory animus, "channeled" that animus to Naberezny who in turn conveyed it to Hearn. (Defs.' Mem., at 2.) Defendants state that there is no evidence establishing that Garcia, or anyone else at the FDNY, "catalyzed" the process of Hearn's search for more information concerning Kregler's 1999 Command Discipline. (*Id.*, at 5–8.) Defendants advance a version of the facts under which Hearn "unilaterally sought more information concerning" the Command Discipline. (*Id.*, at 8.) Defendants further argue that there is no evidence suggesting that Hearn and Garcia communicated directly concerning Kregler. (*Id.*)

As to the latter point, whether or not there was direct communication between Garcia and Hearn is immaterial to Kregler's claim. As long as Garcia communicated to Naberezny false or derogatory information about Kregler in retaliation for Kregler's exercise of First Amendment rights, and Naberezny, in turn, communicated information to Hearn with similar knowledge and intent, Kregler's theory of Garcia's retaliatory animus causing the adverse employment action *may* hold up—

---

**2.** Defendants also argue that, even if Kregler can establish retaliatory animus and causation, a defense exists under *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). (Defs.' Mem. at 10–11.) It is unclear from Defendants' memorandum whether Defendants raise this defense with regards to Garcia, the City, or both defendants. The *Mount Healthy* defense relies on

the argument that Hearn would have reached the same adverse employment decision even in the absence of Garcia's alleged retaliatory act. Such an argument turns on the very same set of facts that relate to Kregler's *prima facie* case. Because the Court finds, as discussed below, that disputed issues of material fact exist, the Court denies summary judgment on *Mount Healthy* grounds.

that is, if Kregler can prove that link at trial.

As for whether Hearn unilaterally sought more information, the relevant point—in the context of a claim that Garcia had retaliatory animus—is who initiated the search for information from Garcia, in particular. On this question, the Court finds that there is a disputed issue of material fact. A November 14, 2005 email from Naberezny to Hearn stated, in reference to following up on Kregler concerning his Command Discipline: "I will ask Chief Garcia—he was the supervisor at the time and if it happened he will know about it." (Pl.'s Rule 56.1 Statement of Undisputed Facts ("Pl.'s 56.1 St."), Ex. 6.)

In addition to the dispute regarding who initiated the conversation with Garcia, there is also a disputed issue of material fact in connection with the timing of any conversation between Naberezny and Garcia. Defendants argue that Garcia was on vacation the week that Naberezny obtained the information about the Command Discipline. (Defs.' Mem., at 9.) However, Kregler cites several factual sources, including testimony from both Garcia and Naberezny in depositions as well as testimony from Garcia at a hearing before this Court, stating that Naberezny consulted with Garcia regarding Kregler's disciplinary violations. (See, e.g., Pl.'s 56.1 St., Ex. 3, at 166–68 (Garcia hearing transcript); Pl.'s 56.1 St., Ex. 23, at 69–73 (Naberezny deposition transcript); Pl.'s 56.1 St., Ex. 26, at 172–174 (Garcia deposition transcript).) Portions of the evidence Kregler cites are inconsistent with some of the information Defendants cite. For exam-

ple, Defendants claim that Garcia was on vacation when Naberezny learned more details about the Command Discipline, but the hearing and deposition transcripts Kregler cites suggest that Naberezny learned of the details of the Command Discipline from Garcia. (See, e.g., Pl.'s 56.1 St., Ex. 23, at 71–73 (excerpt of Naberezny deposition transcript covering Naberezny's conversation with Garcia concerning "something to do with a helicopter and a fax machine"); id. at 70 ("Q: Well, in this case you were asked to vet William Kregler, so who'd you go to? A: Chief Garcia."[3]); Pl.'s 56.1 St., Ex. 26, at 172–174 (Garcia deposition transcript covering Garcia's conversation with Naberezny, in which Garcia states that Naberezny "asked [Garcia] what was in the file" and Garcia told her about the command discipline); Pl.'s 56.1 St., Ex. 3, at 166–68 (hearing transcript in which Garcia states that he remembers speaking with Naberezny one time regarding Kregler in Garcia's office, and that they discussed the disciplinary action)). Neither Garcia nor Naberezny give a precise date for this meeting when the two discussed the Command Discipline. (See Pl.'s 5 6.1 St., Ex. 3, at 168 (Garcia: "I can't even give you the month"); Pl.'s 56.1 St., Ex. 23, at 168 (Naberezny: "I'm not good with dates, but maybe 2005. I don't remember the dates.").) Taken in the light most favorable to Kregler, the evidence that Naberezny received the information about the Command Discipline from Garcia, at an unknown time, disputes at least one of the facts Defendants state: the fact that Garcia was on vacation or that Naberezny

---

**3.** The Court notes a discrepancy between the deposition transcript and a video of the deposition. The deposition transcript reads "Q: Well, in this case you were asked to vet William Kregler, so where would you go?" (Pl.'s 56.1 St., Ex. 23, at 70.) However, the Court, on listening to the question in the video, hears

"who'd you go to?" Another possible interpretation of the video is "who would you go to?" but the Court considers the subsequent question—"Q: And what did he tell you?"—to be more logically consistent with the declarative "who'd" than the conditional "who would."

learned of the Command Discipline from a source other than Garcia.

On a motion for summary judgment it is not appropriate for the Court to make findings requiring determinations of credibility. Viewed in the light most favorable to Kregler, there are at least some facts suggesting that Garcia was Naberezny's initial source of information regarding the details of the Command Discipline, which could in turn support Kregler's argument of causation. Whether this version of the facts holds up in light of other evidence is a matter best suited for trial.

Accordingly, upon review of the record and the parties' submissions, the Court finds that, while it is premature to determine whether Garcia was personally involved in the alleged constitutional violation, Kregler has established a disputed issue of material fact with regard to the causal link between Garcia's statements to Naberezny and Hearn's adverse employment decision. Therefore, Defendants' motion for summary judgment as to Garcia on the basis of failure to establish a *prima facie* case for his § 1983 claim of First Amendment retaliation is denied.

### 2. *Qualified Immunity*

 Defendants argue that, even if the Court does not grant their summary judgment motion on the basis of Kregler's failure to establish causation on his § 1983 claim, the Court should find that Garcia is entitled to qualified immunity from suit. The doctrine of qualified immunity shields government officials performing discretionary functions from liability for civil damages under federal claims insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *See Wilson v. Layne*, 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999); *Ayers v. Ryan*, 152 F.3d 77, 82 (2d Cir.1998). A government official is enti-

tled to qualified immunity when "(1) Plaintiff fails to allege a violation of a federal right; (2) the right alleged was not clearly established at the time of the alleged violation; or (3) the Defendant's actions were objectively reasonable in light of the legal rules that were clearly established at the time it was taken." *Burns v. Citarella*, 443 F.Supp.2d 464, 469 (S.D.N.Y.2006) (*citing Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206, 211–12 (2d Cir.2003); *X–Men Sec., Inc. v. Pataki*, 196 F.3d 56, 65–66 (2d Cir.1999)). Where the plaintiff alleges a violation of a clearly established federal right, "defendants bear the burden of showing that the challenged act was objectively reasonable in light of the law existing at that time." *Varrone v. Bilotti*, 123 F.3d 75, 78 (2d Cir.1997) (*citing Harlow v. Fitzgerald*, 457 U.S. 800, 815, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).

Here, Kregler alleges that Garcia violated his clearly established constitutional rights by retaliating against Kregler based on Kregler's political opinions. Specifically, Kregler claims that Garcia colluded with Naberezny to sabotage Kregler's City Marshal application based on Kregler's endorsement of a particular political candidate. Defendants deny that Garcia ever communicated with Naberezny before the decision was made not to offer Kregler a City Marshal position, and that therefore Garcia's actions could not have influenced Hearn's ultimate decision not to approve Kregler's application.

If Garcia did act as Kregler alleges, his actions violated Kregler's clearly established constitutional rights. *See DePace v. Flaherty*, 183 F.Supp.2d 633, 641 (S.D.N.Y. 2002) ("It long has been established by the Supreme Court and the Second Circuit that, '[a]s a general rule, employees may not be dismissed for the exercise of their First Amendment rights.' ") (*citing Kaluczky v. City of White Plains*, 57 F.3d

202, 208 (2d Cir.1995); *Elrod v. Burns,* 427 U.S. 347, 360, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Pickering v. Board of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). Furthermore, Garcia's actions cannot be considered objectively reasonable. *See id.* at 642 ("It would have been objectively unreasonable for [defendant] to believe that adverse employment action against ... an employee who exercised his First Amendment rights was permissible.").

Because these questions turn on the parties' conflicting accounts of Garcia's actions discussed above, the Court finds that issues of material fact remain in dispute regarding Garcia's qualified immunity claim. Dismissal on the basis of a qualified immunity defense is not appropriate where there are facts in dispute that are material to a determination of reasonableness. *See Thomas v. Roach,* 165 F.3d 137, 143–45 (2d Cir.1999); *Lennon v. Miller,* 66 F.3d 416, 421 (2d Cir.1995). Without a fuller factual record to be developed at trial, the Court is not in a position to determine whether Defendants have satisfied their burden of proving that Garcia's actions were objectively reasonable. Therefore, at this time the Court denies Defendants' motion for summary judgment predicated on Garcia's claim of qualified immunity.[4]

### B. *CLAIMS AGAINST THE CITY*

A municipality may be held liable only "when execution of [its] policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury[.]" *Monell,* 436 U.S. at 694, 98

S.Ct. 2018. Kregler advances the theory that Hearn's decision regarding Kregler's City Marshal application constitutes an act of the City and that this employment decision represents a municipal policy. Kregler cites cases establishing that a single decision can represent municipal policy, *see, e.g., Pembaur,* 475 U.S. at 480, 481, 106 S.Ct. 1292; *Jeffes v. Barnes,* 208 F.3d 49, 57 (2d Cir.2000), and cases establishing that the decision of a city's authorized decisionmaker represents an act of official government policy, *see Pembaur,* 475 U.S. at 481, 106 S.Ct. 1292.

■■■ Although Hearn made the employment decision, the actor alleged to have committed the First Amendment retaliation is Garcia, not Hearn. Kregler argues that the City is liable to Kregler for Hearn's decision under the "cat's paw" theory of liability. "In a cat's paw scenario, a nondecisionmaker with a discriminatory motive dupes an innocent decisionmaker into taking action against the plaintiff." *Saviano v. Town of Westport,* No. 04 Civ. 522, 2011 WL 4561184, at *7 (D.Conn. Sept. 30, 2011) (*citing Staub v. Proctor Hosp.,* —— U.S. ——, 131 S.Ct. 1186, 179 L.Ed.2d 144 (2011)).

The development of Second Circuit case law concerning the cat's paw theory is relatively new and evolving. Under the cat's paw theory as described in *Nagle v. Marron,* "a final decisionmaker that relies entirely on an improperly motivated recommendation from a subordinate may render the municipality liable because the subordinate, although not formally delegated the power to make decisions, acts as the municipality's agent." 663 F.3d 100, 117 (2d Cir.2011). The *Nagle* Court dis-

---

4. In a letter dated November 12, 2013, Defendants misstate the Court's responsibility regarding Garcia's qualified immunity claim, arguing that "before trial, a district court must decide a defendant's invocation of qualified immunity." (Dkt. No. 143.) The Court need not make an ultimate determination regarding qualified immunity if material facts remain in dispute. *See Thomas v. Roach,* 165 F.3d 137, 143–45 (2d Cir.1999).

cussed the underlying rationale for the cat's paw theory: "Some Circuits have held that 'an employer cannot shield itself from liability ... by using a purportedly independent person or committee as the decisionmaker where th[at] decisionmaker merely serves as the conduit, vehicle, or rubber stamp by which another achieves his or her unlawful design.'" *Id.* (*quoting Dedmon v. Staley*, 315 F.3d 948, 949 n. 2 (8th Cir.2003)).

As of the time of the *Nagle* decision, "our Circuit has neither accepted nor rejected the cat's paw approach." *Id.* at 118. The Second Circuit has not ruled on the issue of cat's paw liability since the *Nagle* case. However, several cases in district courts in this Circuit have considered the application of the cat's paw theory of liability—in other employment discrimination contexts, but not in § 1983 actions—and

these cases generally endorse the cat's paw theory.[5]

The Second Circuit has not held that the cat's paw theory applies in the context of a § 1983 claim, although the *Nagle* Court noted that "several Circuits have either held or assumed that cat's paw liability would be available under § 1983." *Id.* at 117–18 (citing cases from the Sixth, Seventh, and Eight Circuits). In *Nagle*, the Second Circuit remanded the question of cat's paw liability to the district court for determination in the first instance. *See id.* at 118. However, the parties settled before the district court made such determination, and the Circuit Court has not yet had another occasion to rule on the issue.

In each of the two post-*Nagle* district court cases in this Circuit to consider the applicability of cat's paw liability to a § 1983 claim—*Monz v. Rocky Point Fire District*[6] and *Rajaravivarma v. Board of*

---

5. *See, e.g., Zagaja v. Village of Freeport*, No. 10 Civ. 3660, 2013 WL 2405440, at *12 (E.D.N.Y. June 3, 2013) (denying motion for reconsideration of order denying summary judgment in Title VII discrimination and retaliation claims where plaintiff relied in part on cat's paw theory of liability); *Pietri v. New York State Office of Court Admin.*, 936 F.Supp.2d 120, 133 n. 13 (E.D.N.Y.2013) (discussing cat's paw theory in Title VII context but declining to extend cat's paw liability to individual defendants because "individuals are not subject to liability under Title VII"); *Daniels v. Pioneer Cent. Sch. Dist.*, No. 08 Civ. 767, 2012 WL 1391922, at *2–*4 (W.D.N.Y. Apr. 20, 2012) (dismissing defendant's argument that cat's paw liability does not apply to age discrimination claim under the Age Discrimination in Employment Act ("ADEA")); *Herbert v. National Amusements, Inc.*, No. 08 Civ.1945, 2012 WL 201758 (D.Conn. Jan. 23, 2012) (denying motion to exclude cat's paw liability in a "traditional employment discrimination case" involving ADEA and state law employment discrimination claims).

6. In *Monz v. Rocky Point Fire District*, the court granted judgment as a matter of law for defendants after a jury trial in a First Amendment retaliation case brought under §. 1983.

853 F.Supp.2d 277 (E.D.N.Y.2012), *aff'd*, 519 Fed.Appx. 724 (2d Cir.2013). In that case, the plaintiff claimed that the defendants—a fire department and other parties related to the fire department—retaliated against plaintiff's allegedly protected speech in declining to reinstate plaintiff to the fire department after his resignation and subsequent application for reinstatement. *See id.* The *Monz* Court decided in favor of defendants as a matter of law because, among other reasons, the court determined that the plaintiff did not establish the causal connection between his protected speech and the adverse employment action. *See id.* at 288–89. Nonetheless, the decision contained dicta declining to extend cat's paw liability to a § 1983 action: The *Monz* Court stated that "the Second Circuit has yet to determine whether this approach—the so-called 'cat's paw' theory of liability—is applicable in the context of § 1983 actions." *Id.* at 288 n. 13 (*citing Nagle*, 663 F.3d at 118). The *Monz* Court went on to state explicitly that "the Court will not do so here." *Id.*

However, the *Monz* case is distinguishable from the present case in several ways. The *Monz* plaintiff, unlike Kregler, "did not explicitly argue [the cat's paw] theory of liabili-

*Trustees for Connecticut State University System*[7]—the court dismissed the case for other reasons before reaching a decision on whether cat's paw liability applies.

This Court is not persuaded that, even when viewed in the light most favorable to Kregler, the facts at issue in the instant case, combined with the numerous complex legal issues described below, present the appropriate circumstances for a court to determine whether to apply the cat's paw theory to a § 1983 claim. The Court finds the facts involved in this case distinguishable from those underlying the decisions in the Sixth, Seventh, and Eighth Circuits that "held or assumed that cat's paw liability would be available under § 1983." *Nagle,* 663 F.3d at 117 (*citing Campion, Barrow & Assocs., Inc. v. City of Springfield, Ill.,* 559 F.3d 765, 771 (7th Cir.2009) ("[E]vidence could support a finding that X (the [City] Council) relied on Y's (the Mayor's or [an alderman's]) intent, making it permissible to base municipal liability on Y's discriminatory animus."); *Arendale v. City of Memphis,* 519 F.3d 587, 604 n. 13 (6th Cir.2008) ("When an adverse hiring decision is made by a supervisor who lacks impermissible bias, but that supervisor was influenced by another individual who was motivated by such bias, this Court has held that the employer may be held liable under a 'rubber-stamp' or 'cat's paw' theory of liability."); *Dedmon,* 315 F.3d at 949 n. 2 ("[A]n *employer* can be liable, under certain circumstances, where the formal decisionmaker is not the person who harbored an unlawful motive to terminate the employee.") (emphasis in original)).

None of these decisions dealt with a factual pattern analogous to that of the instant case. Here, Kregler alleges that a tainted act was committed by Garcia, then the Chief Fire Marshal. Garcia was neither the subordinate of nor even employed by the same New York City agency as the decisionmaker, Hearn. To be sure, the FDNY and DOI shared information, but the relationship between Garcia and Hearn was unlike the typical cat's paw case, where the fabled "monkey," or bad actor, is an agent of the "cat," or innocent decisionmaker.[8] In *Campion,* the City Council

---

ty." *Id.* at 288 n. 13. Moreover, in *Monz* "no facts were introduced to establish" the impermissible motive of the particular defendants whose alleged retaliatory animus could potentially be attributed to their employer under the cat's paw theory. *Id.* Thus, considering that plaintiff did not argue the cat's paw theory and the *Monz* Court did not see facts sufficient to support cat's paw liability, this Court finds that the *Monz* case neither supports nor rejects the applicability of the cat's paw theory to § 1983 cases but does serve as a reminder that a district court should proceed with caution in extending legal theories from one context to another without sufficient guidance from the appellate court.

7. In *Rajaravivarma v. Board of Trustees for Connecticut State University System,* the court granted summary judgment on Title VII retaliation and § 1981 race discrimination claims based on a determination that the plaintiff failed to establish that the defendant's "legitimate" reasons for the adverse employment action were merely pretextual. *See* 862 F.Supp.2d 127, 166–67 (D.Conn.2012). In discussing whether cat's paw liability could apply to § 1981 claims brought pursuant to § 1983, the *Rajaravivarma* Court found that the plaintiff's allegations could not survive summary judgment, even assuming, "without holding," that the cat's paw theory applied in the context of § 1981 discrimination claims brought pursuant to § 1983. *See id.* at 167.

8. The source of the term "cat's paw" is an Aesop's fable as relayed in a 1679 La Fontaine poem and "injected into United States employment discrimination law by [Judge] Posner in 1990." *Staub v. Proctor Hosp.,* —— U.S. ——, 131 S.Ct. 1186, 1190 n. 1, 179 L.Ed.2d 144 (2011) (*citing Shager v. Upjohn Co.,* 913 F.2d 398, 405 (7th Cir.1990)). In the fable, a monkey induces a cat to extract roasting chestnuts from a fire. After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing. *Id.*

played the part of the "cat" acting as the decisionmaker on an employment contract, and the "monkey" with the allegedly discriminatory animus was an alderman who sat on the City Council. *See Campion,* 559 F.3d at 769–770. In *Arendale,* both the decisionmaker and the bad actor were members of the Memphis Police Department. *See Arendale,* 519 F.3d at 590–593. In *Dedmon,* the bad actor was an employee of the Pulaski County Circuit Clerk's office and the decisionmaker was the Pulaski County Circuit Clerk. *Dedmon,* 315 F.3d at 949.

■ In none of these cases did the two principal players work in different offices, departments, or agencies with no direct relationship or channel of communication with one another. This distinction is important. Cat's paw liability is based on agency principles. Thus a substantial question arises as to whether a bad actor with whom the decisionmaker has no official connection, and to whom the decisionmaker has not delegated authority to carry out any official action, may legally be deemed an agent of that decisionmaker. The doctrine is also premised on the theory, as the court noted in *Saviano,* 2011 WL 4561184, at *7, that a bad actor with discriminatory intent "dupes" the unsuspecting decisionmaker, who thus serves as a mere "conduit" or "rubber stamp" of the subordinate. *Nagle,* 663 F.3d at 117. Such deliberate deception assumes a close enough personal or official relationship by reason of which the decisionmaker places reliance and trust in the tainted recommendation of a bad actor who happens to occupy a position of sufficient confidence with the decisionmaker to be able to corrupt the determination at issue, and thus achieve the biased subordinate's own

wrongful end.[9] Ordinarily, persons unknown to a decisionmaker would not be empowered to exercise that degree of decisive machination. And if, as Kregler alleges, the bad actor seeks to taint a decision by using intermediaries—if in the fable the monkey had not used his malice to dupe the cat directly, but had instead employed a lamb or a snake as a conduit for harmful conduct—some conceptual difficulties regarding causation would arise to complicate application of the cat's paw principle. If the third-person intermediary serves as an unwitting pawn of the malevolent actor, it would render it much harder to assess the extent to which the wrongdoer's poison actually infected the decisionmaker with the requisite knowledge and discriminatory intent. If, on the other hand, the bad actor employs a subordinate of the decisionmaker as a surrogate whose official duty the wrongdoer corrupts by working in concert to improperly taint the determination in question, the circumstances would raise another substantial issue: whether in view of the treachery, the subordinate may still be deemed to be serving as agent of the decisionmaker. In either event, the chain of causation leading to the decisionmaker is thrown into doubt for the purposes of imposing municipal liability.

In this case, not only did Garcia lack an official or personal relationship with Hearn that would enable him to "dupe" her into rubber-stamping his wrongful purpose, it was Hearn herself who initiated further inquiry into Kregler's Command Discipline. Hearn was in a position far from any situation in which she could fall prey to being used by Garcia as a conduit for retaliatory discrimination. Moreover, to the extent Kregler would argue that it was Naberezny who played the bad actor in the

---

9. This close relationship of the bad actor situated in a position which creates opportunities to improperly influence the decisionmaker makes Iago a more apt model to play the villainous subordinate.

role of manipulating Hearn, the Court finds no evidentiary support in the record from which a reasonable jury could conclude that Naberezny harbored animus toward Kregler and transmitted it to Hearn to achieve the retaliatory end that allegedly motivated Garcia. In other words, unlike the typical pattern in cat's paw theory, Naberezny was not the decisionmaker herself, nor was she the decisionmaker's subordinate who, acting on her own malice towards Kregler, initiated the recommendation that resulted in an unlawful official decision.

Moreover, unlike the typical cat and monkey roles, here there were additional layers of attenuation between Garcia and Hearn. Kregler's theory that Garcia gave information to Naberezny that was tainted by retaliatory animus, and that Naberezny in turn provided information to Hearn which was also tainted, strains the cat's paw theory beyond existing case law. In *Arendale,* there was one alleged bad actor reporting directly or in a direct chain of command to multiple supervisors acting as decisionmakers. *See Arendale,* 519 F.3d at 603–604 (affirming district court grant of summary judgment on a disparate treatment claim because, in part, "[e]ven if this Court were to assume that Lieutenant Cox exerted sufficient influence over his white supervisors to impute his alleged racial animus onto them," plaintiff still had not demonstrated disparate treatment). In *Dedmon,* there was a direct relationship between the decisionmaker and the alleged bad actor. *See Dedmon,* 315 F.3d at 949 (Pulaski County Circuit Clerk and her subordinate). In *Campion,* the alleged bad actor was himself a member of the decisionmaking body. *See* 559 F.3d at 769–770 (alderman on City Council).

In light of the lack of precedent in the Second Circuit applying the cat's paw theory of liability to the context of a § 1983

action, and the gulf between the facts in this case and the facts in a typical cat's paw case for employer liability, the Court grants Defendants' motion for summary judgment as to the City.

## III. ORDER

For the reasons discussed above, it is hereby

**ORDERED** that the motion (Docket No. 138) of defendants the City of New York and Louis Garcia is **GRANTED** as to defendant the City of New York; and it is further

**ORDERED** that the motion (Docket No. 138) of defendants the City of New York and Louis Garcia is **DENIED** as to defendant Louis Garcia.

The Clerk of Court is directed to terminate any pending motions.

**SO ORDERED.**